730 F.2d 236
 10 Collier Bankr.Cas.2d 549, 11 Bankr.Ct.Dec. 1081,
Bankr. L. Rep. P 69,851
 Ronald E. GRUBBS, Plaintiff-Appellant,
v.
HOUSTON FIRST AMERICAN SAVINGS ASSOCIATION, Defendant-Appellee.
 No. 82-2544.
 United States Court of Appeals,
Fifth Circuit.
 April 19, 1984.
 
 Michael J. Pledger, Houston, Tex., for plaintiff-appellant.
 Calvin, Dylewski, Gibbs, Maddox & Russell, Don F. Russell, Houston, Tex., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.
 TATE, Circuit Judge:
 
 
 1
 The issues before us on en banc rehearing require an interpretation of some provisions of Chapter 13 of the Bankruptcy Code of 1978, 11 U.S.C. Secs. 101 et seq. (hereafter, "the Code"). This chapter provides for the adjustments of the debts of an individual with regular income, through extensions and composition plans, usually extending no more than three years, Sec. 1322(c) of the Code, funded out of the Chapter 13 petitioner's future income (which is submitted to the court for the payment of the debts as provided for by the plan, Sec. 1322(a) of the Code). The adjustments and extensions so allowed, however, are subject to provisions that protect the interests of creditors, including, inter alia, their secured interests.
 
 
 2
 The precise issue, as presented to the trial courts and to this court, is whether a bankruptcy court may decline to approve a Chapter 13 plan solely because a debtor proposes to pay off in installments during the term of the plan past-due amounts on a promissory note (secured by a lien on the debtor's principal residence) that was properly accelerated and became fully due under state law prior to the filing of the debtor's Chapter 13 petition. Affirming the bankruptcy and district courts, on original hearing, a panel of this court held that the Chapter 13 petitioner Grubbs' "plan could not be confirmed for the reason that it proposed to cure a pre-petition default and acceleration on a debt on Grubbs' principal residence contrary to Section 1322(b) of the Code." 718 F.2d 694 (5th Cir.), reh'g en banc granted, 718 F.2d 699 (5th Cir.1983).
 
 
 3
 We hold to the contrary. Consistent with the only circuit court decision that has thus far addressed this issue, In re Taddeo, 685 F.2d 24 (2d Cir.1982), we find, for reasons to be stated, that Section 1322(b) of the Code, construed in the light of its legislative history and of its context within Chapter 13 as a whole, evinces no legislative intent that a home-mortgagor debtor is barred either (a) from curing a pre-petition acceleration into maturity of the unpaid installments due upon his home mortgage, or (b) from proposing (in his Chapter 13 plan for consideration by the bankruptcy court) that all past due or matured amounts secured by his home mortgage be paid during the term of his plan, if approved by the court--so that, thereby, proceedings upon foreclosure of his home mortgage may properly be stayed, while permitting the debtor to pay off his arrearages in accordance with the terms of a plan confirmed by the court.
 
 Facts and Issues Presented
 
 4
 For present purposes, the salient facts are these:
 
 
 5
 In April 1979, the debtor Grubbs borrowed some $12,500 from the creditor-appellee ("Houston First"), a savings and loan association. The promissory note in that amount, payable in monthly installments, was secured by a second lien encumbrance upon Grubbs' principal residence. In February 1980, as authorized by the note's terms, Houston First notified Grubbs that, because of his delinquency in payment of the monthly installments, it had elected to accelerate into maturity the full balance of the note. In June 1981, Houston First instituted foreclosure proceedings in state court. In July 1981, Grubbs filed a Chapter 13 petition in federal bankruptcy court, which had the consequence of staying the foreclosure proceedings. Sec. 362(a) of the Code.[1] In February 1982, Grubbs filed an amended Chapter 13 petition, in which he proposed to pay off all delinquent and matured amounts by monthly installments over the 36 months of the proposed plan.
 
 
 6
 In June 1982, a hearing before the bankruptcy court was held on the confirmation of Grubbs' Chapter 13 plan. At this hearing, the sole urged objection by Houston First to confirmation of the plan was that when "a secured note on a homestead has been accelerated and matured prior to the filing of the bankruptcy petition, it is not subject to being reinstated and cured under a Chapter 13 petition plan." The bankruptcy court sustained this objection, based upon Sec. 1322(b) of the Code. It ordered Grubbs' Chapter 13 petition be dismissed, unless within ten days he either met Houston First's objection (which, in effect, required immediate payment by Grubbs of the entire matured balance of the note, in order for him to avoid foreclosure of his home) or else moved to convert the case to a Chapter 7 (liquidation) proceeding under the Code.
 
 
 7
 The issues of this appeal arise of a provision of Section 1322(b) of the Code, to be quoted below, to the effect that a proposed plan may not "modify" the rights of holders of claims secured by only a security interest in real property that is the debtor's principal residence. The precise question thus posed for our review by the bankruptcy court's ruling is whether a Chapter 13 petitioner is barred by Section 1322(b) from proposing a plan that provides for cure of a pre-petition acceleration into maturity of the entire debt due; but this issue, in turn, implicates the question of whether Sec. 1322(b) bars--as a "modification" of the creditor's security interest--the bankruptcy court's approval of a Chapter 13 plan that provides for the payment (in thirty-six monthly installments over the term of the proposed plan, rather than immediately) from future income of past matured amounts due on a home mortgage. Reversing the bankruptcy court, we answer both questions, "No."
 
 I.
 
 8
 The precise issue before us involves a determination of the legislative intent expressed by the wording of Sec. 1322(b), to be quoted below. Before we parse the terms of this section, however, an understanding of its meaning may be furthered by brief reference to some relevant general provisions and purposes of Chapter 13 of the 1978 Code, of which Sec. 1322 forms a part. In the light of these--and of the particular legislative history of Section 1322(b), see III, infra --, any seeming ambiguity of the provision is dispelled or, at the least, must be resolved against the creditor appellee's contention that was upheld by the bankruptcy court.
 
 
 9
 The Bankruptcy Code of 1978 was enacted as the result of a legislative process that commenced in 1970. In that year, Congress created the Commission on the Bankruptcy Laws of the United States, which in 1973 issued a report containing (Part I) its finding and recommendations and (Part II) a draft of a bill to implement them.[2] Legislation to implement the Commission's recommendations was introduced in both houses of Congress and extensive hearings held thereon in the 93rd, 94th, and 95th Congresses.
 
 
 10
 The final enactment of the Code in the 95th Congress resulted from the passage of H.R. 8200 of the House and S. 2266 by the Senate (passed as an amendment to H.R. 8200), followed by mutual amendments made by each body, and the enactment by them of a final conformed bill in October, 1978. 1 Collier on Bankruptcy p 1.03 (15th ed., 1983); Klein, The Bankruptcy Reform Act of 1978, 53 Am.Bankr.L.J. 1, 3 (1979). With regard to Chapter 13 of the 1978 Code, both Senate and House bills adopted in presently pertinent aspects the Commission's recommendations and statutory scheme. S.Rep. No. 989, 95th Cong., 2d Sess. 1, 2, 12-13, 141-42 (1978); H.Rep. No. 595, 95th Cong., 1st Sess. 1, 2, 4-5, 116-125, 180-81 (1977), U.S.Code Cong. & Admin.News, p. 5787.
 
 
 11
 The House Report accompanying the introduction of H.R. 8200, which substantially incorporated the provisions that were finally enacted as Chapter 13 of the Code, explained the Chapter's purpose:
 
 
 12
 The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases, the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement. During the repayment period, creditors may not harass the debtor or seek to collect their debts. They must receive payments only under the plan. This protection relieves the debtor from indirect and direct pressures from creditors, and enables him to support himself and his dependents while repaying his creditors at the same time.
 
 
 13
 The benefit to the debtor of developing a plan of repayment under chapter 13, rather than opting for liquidation under chapter 7, is that it permits the debtor to protect his assets. In a liquidation case, the debtor must surrender his nonexempt assets for liquidation and sale by the trustee. Under chapter 13, the debtor may retain his property by agreeing to repay his creditors. Chapter 13 also protects a debtor's credit standing far better than a straight bankruptcy, because he is viewed by the credit industry as a better risk. In addition, it satisfies many debtors' desire to avoid the stigma attached to straight bankruptcy and to retain the pride attendant on being able to meet one's obligations. The benefit to creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy.
 
 
 14
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 118 (1977), U.S.Code Cong. & Admin.News, p. 6079.
 
 
 15
 Of context relevance to present issues, by the new Chapter 13 the legislation as introduced sought to cure deficiencies of the Chapter XIII of the former (now repealed) Bankruptcy Act of 1898 (as amended), with regard, inter alia, to: 1) the erratic and uncertain application "resulting from a hodgepodge of state and federal statutory provisions," S.Rep., supra at 13, U.S.Code Cong. & Admin.News, p. 5799; 2) permitting modification of the claims of secured creditors to reduce the creditor's security interest to the actual value of the goods secured, H.Rep., supra at 124;[3] and 3) with regard to long-term debts extending beyond the three years of the petitioner's plan, a new authority to permit the Chapter 13 petitioner to provide for the curing of any default within a reasonable time and to maintain the payments while his Chapter 13 case was pending, H.Rep., supra at 429, Bankruptcy Laws Commission's Report, H.R. Doc. 137, pt. 2, 93rd Cong., 1st Sess. 205-206 (1973).
 
 II.
 
 16
 We have set out Section 1322(b) in the margin.[4] Section 1322(b) provides that, as a general rule, pursuant to a "plan" in a Chapter 13 proceeding a debtor may "modify" the rights of holders of secured claims. Sec. 1322(b)(2). Further, the debtor's plan may provide for "the curing ... of any default." Sec. 1322(b)(3). The debtor's plan, however, may not "modify" the rights of holders of secured interests in the debtor's principal residence, Sec. 1322(b)(2), although specifically notwithstanding that provision, a debtor's plan may provide for "the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due," 11 U.S.C. Sec. 1322(b)(5).
 
 
 17
 The courts interpreting this provision are in general agreement that a proposed plan may cure a pre-petition default if the debt has not been accelerated prior to filing of a Chapter 13 petition and that an accelerated debt may not be cured if it has actually resulted in a foreclosure sale to a third party.[5] However, as to other situations between these limits, several lines of authority have developed with regard to the curing of a default that has been accelerated prior to the filing of a Chapter 13 petition.[6]
 
 
 18
 These discrepancies have developed because, with regard to the issue before us, on its face the statute seems to present an ambiguity with regard to the curing of a default on "a claim secured only by a security interest in real property that is the debtor's principal residence." Sec. 1322(b)(1). If read without reference to its statutory history and context, the literal wording of Sec. 1322 is open to the interpretation that (b)(3) (permitting the plan to "provide for the curing of any default") is not applicable to a home-mortgage debt, and that a default on a long-term home mortgage may be cured only if "the last payment is due after the date on which the final payment under the plan is due," (b)(5) (emphasis supplied).
 
 
 19
 Indeed, if so read,--and if the term "on which the last payment is due" is given its state-law meaning as to an accelerated debt that thereby becomes fully "due"[7]--, then Sec. 1322(b) may be construed as did the panel.[8] It thus would bar--whenever the home mortgage debt had been accelerated prior to a debtor's petition--any Chapter 13 relief by which the debtor could save his home by paying past-due amounts on his home-mortgage through periodic payments over the term of his Chapter 13 plan, if approved by the bankruptcy court.
 
 
 20
 A contrary construction was reached by the Second Circuit in In re Taddeo, 685 F.2d 24 (2d Cir.1982), the only circuit court appellate decision thus far on the issue. There, the Chapter 13 petitioners were permitted to cure the default by payments of the arrears made pursuant to their plan, despite the home-mortgage debt's pre-bankruptcy acceleration under state law, and to reinstate the original payment schedule of their long-term home mortgage. In so holding, with succinct summary of the legislative history of the provision and the meaning of the terms "curing a default" and "modify" as so reflected, 685 F.2d at 27-28 (see also III infra ), the Second Circuit concluded:
 
 
 21
 First, we think that the power to cure must comprehend the power to "de-accelerate." This follows from the concept of "curing a default." A default is an event in the debtor-creditor relationship which triggers certain consequences--here, acceleration. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code.
 
 
 22
 * * *
 
 
 23
 Secondly, we believe that the power to "cure any default" granted in Sec. 1322(b)(3) and (b)(5) is not limited by the ban against "modifying" home mortgages in Sec. 1322(b)(2) because we do not read "curing defaults" under (b)(3) or "curing defaults and maintaining payments" under (b)(5) to be modifications of claims.
 
 
 24
 Id. at 26-27 (emphasis the court's).
 
 
 25
 In construing Sec. 1322(b), Taddeo rejected a contention similar to that raised by the present mortgage creditor that state law must determine the effect of the creditor's acceleration and the ability of a debtor to cure his default. 685 F.2d at 28-29. It found that, in enacting Sec. 1322(b), Congress had intended to permit cure in bankruptcy proceedings as authorized by the federal code. Id.[9]
 
 
 26
 Aside from the technically sound reasons for its statutory construction, Taddeo additionally pointed out:
 
 
 27
 Policy considerations strongly support this reading of the statute. Conditioning a debtor's right to cure on its having filed a Chapter 13 petition prior to acceleration would prompt unseemly and wasteful races to the courthouse. Worse, these would be races in which mortgagees possess an unwarranted and likely insurmountable advantage: wage earners seldom will possess the sophistication in bankruptcy matters that financial institutions do, and often will not have retained counsel in time for counsel to do much good. In contrast, permitting debtors in the Taddeos' position to de-accelerate by payment of the arrearages will encourage parties to negotiate in good faith rather than having to fear that the mortgage will tip the balance irrevocably by accelerating or that the debtor may prevent or at least long postpone this by filing a Chapter 13 petition.
 
 
 28
 685 F.2d at 27.
 
 
 29
 We believe Taddeo to be correctly decided. Indeed, the doctrinal commentary upon it thus far has been unanimously favorable,[10] and its construction of the intent and meaning of Section 1322(b) is consistent with that reached by a leading treatise even prior to its decision. 5 Collier on Bankruptcy, supra, at p 1322,01[C][ii], [D].
 
 III.
 
 30
 In its concise summary of the legislative history, 685 F.2d at 27-28, Taddeo did not find it necessary to parse separately clauses (2), (3), and (5) of Sec. 1322(b). In view of the importance given by the panel (see note 8 supra ) and at en banc consideration to the meaning of each of these clauses, we deem it advisable to set forth in more detail than did Taddeo the genesis and intention of each of these clauses as disclosed by their legislative history.
 
 A. House Legislation
 
 31
 The Bankruptcy Code of 1978, enacted by the 95th Congress, was the ultimate product of similar legislation introduced in the 93rd and 94th Congresses endeavoring to carry out, in the main, the recommendations of a 1973 report of the Commission on the Bankruptcy Laws. See text supra at note 2.
 
 
 32
 Section 1322(b) as finally amended was, with the exception of two amendments, substantially the version found in H.R. 8200 of the 95th Congress, which with regard to the provisions at issue was closely patterned upon the legislation proposed by the Bankruptcy Commission. These two amendments, however, gave rise to the issues presented by the present litigation; nevertheless, in the light of the legislative history of the provisions--as will be shown--, they were not intended to change the original import of the provision insofar as curing pre-petition accelerations of home mortgage debts and insofar as permitting the home mortgagor to pay off any pre-petition matured amounts during the life of the Chapter 13 plan.
 
 
 33
 As originally introduced, H.R. 8200's Sec. 1322(b) provided that the debtor's plan might
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 (2) modify the rights of holders of secured claims or of holders of unsecured claims;
 
 
 37
 (3) provide for the curing or waiving of any default;
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 (5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; * * * ;
 
 
 41
 The intent of these provisions, as stated by the committee report, was to the following effect: Under (b)(2), the plan could modify the rights of holders both of secured and of unsecured claims; under (b)(3), the plan could provide for the cure and waiving of any default; and (b)(5), which concerned long-term debt, the plan could provide for curing a default and maintaining payments while the case was pending.[11]
 
 
 42
 It is important to note the following: At this point, the House-proposed legislation explicitly treated the "modification", (b)(2), of a secured and unsecured debt as distinguishable from the "curing" of a default, (b)(3); and these provisions were applicable to all debts subject to adjustment under a Chapter 13 plan (which generally, permitted discharge of pre-petition obligations provided for by the plan, except long-term obligations extending beyond the plan, see Sec. 1328(a)). However, (b)(5) related only to long-term obligations not provided for by the plan except for curing the default, upon which the last payment was due after the expiration of the plan (and from which the plan statutorily could not result in a discharge, Section 1328(a))[12]; as to which obligations, (b)(5) permitted relief by way of curing defaults and reinstating the original agreed payment schedule.
 
 
 43
 Most important to an understanding of the subsequent amendments is that, as originally introduced, the House legislation permitted a plan to "modify" any secured indebtedness, including that represented by a home mortgage or other real estate lien. (In this regard, for example, the Code permitted a modification by the reduction of the secured creditor's lien to only the value of the collateral, Secs. 506(a), 1325(a)(5).)
 
 B. Bankruptcy Commission Version
 
 44
 The genesis of these House provisions was in Section 6-201(2), (4) of the legislation proposed by the Bankruptcy Commission to accomplish its recommendations, providing that a plan:
 
 
 45
 (2) may include provisions dealing with claims secured by personal property severally, on any terms, and may provide for the curing of defaults within a reasonable time and otherwise alter or modify the rights of the holders of such claims; ...
 
 
 46
 (4) may include provisions for the curing of defaults within a reasonable time and the maintenance of payments while the case is pending on claims secured by a lien on the debtor's residence and on unsecured claims or claims secured by personal property on which the last payment is due after completion by the debtor of all payments under the plan;
 
 
 47
 Bankruptcy Laws Commission's Report, H.R. Doc. 137, pt. 2, 93d Cong., 1st Sess. 204 (1973).
 
 
 48
 With regard to clause (2), the predecessor of the House's Sec. 1322(b)(2) and (3) (except that the House version expanded the modification power to include claims secured by real as well as personal property), the Commission's explanatory note stated, in part, that the "modification" power so recommended included authorization to change "the size and timing of installment payments as well as the alteration or modification of other provisions of the secured creditors' contract." Id., p. 205.
 
 
 49
 With regard to clause (4), the predecessor of the House's Sec. 1322(b)(5), the Commission's explanatory note states that the intent of this new provision was to confer "a limited authority to deal with claims secured by a lien on the debtor's residence and long-term claims which cannot be fully paid under the plan." Id. However, the report emphasized that
 
 
 50
 this clause does not authorize reduction of the size or varying of the time of installment payments nor, except in instances where the last payment on a claim secured by a lien on the debtor's residence is due during the term of the plan, is it contemplated that the claim would be fully paid off under the plan. Any unpaid balance would not be covered by a discharge granted pursuant to Sec. 6-207. But while the debtor is operating under the plan, he may be able to employ the authorization given under this clause to preserve his equity in his home and to keep current on long-term debt by provisions in the plan for curing defaults and maintaining payments.
 
 
 51
 Id., pp. 205-06.
 
 
 52
 C. The Subsequent Senate and Concurrent Actions
 
 
 53
 The subsequent amendments of Sec. 1322(b)(2) and (5) to be described must be viewed in the context of the House provisions that incorporated the concepts of the Commission's recommended legislation.
 
 
 54
 In this context, with regard to debts that were provided for by the Chapter 13 plan (most often, although not necessarily so limited, pre-petition debts that matured prior to or during the term of the plan), the power to "cure" a default that had accelerated a debt was treated separately from any provision to "modify" such a debt--and these permitted "modifications" included changing the size and timing of installments payment, as well as reducing the secured debtor's security interest to the value of the collateral as contrasted with the amount of the secured debt, see note 3 supra and Secs. 506, 1325(a)(5). The distinguishable "modify" and "cure" provisions were the subjects of Sec. 1322(b)(2) and (3), respectively.
 
 
 55
 However, independently of these provisions, a plan was additionally authorized to provide for the curing of defaults and the maintenance of payments--during the period that the Chapter 13 proceeding was pending--on a long-term debt that was not otherwise provided for by the plan, and thus was not dischargeable under Chapter 13. Consequently, the debtor could during the term of the plan fully pay off arrearages that had matured prior to the filing of his Chapter 13 petition, along with his maintaining payments coming due during the term of the plan--at the conclusion of which, if all payments were made, the debtor would owe the unpaid balance of a long-term debt, payable in installments according to its original terms. This concept was the basis of Sec. 1322(b)(5), a provision that, as a primary purpose, was designed to enable a debtor to preserve his equity in his mortgaged home and to provide a means to restore and maintain his currency on a long-term debt not otherwise provided by the plan.
 
 
 56
 The subsequent Senate and concurrent amendments to H.R. 8200's Section 1322(b) were not designed to change its conceptual structure as so outlined.
 
 
 57
 So far as we could find, during a Senate committee hearing held during the 94th Congress the secured creditors' advocates advanced no objection to the curing of default accelerations. Rather, their attack concentrated upon provisions that permitted modification of a secured claim by reducing the amount of the periodic installments due thereupon (as contrasted with the non-objectionable curing of a default and maintaining those payments), and upon the provisions that permitted reduction of the secured amount of the claim to the value of the collateral. Hearings Before the Subcommittee on Improvements of the Judicial Machinery of the Senate Committee on Judiciary, 94th Cong., 1st Sess. (1975) (Statements of Walter Vaughan on behalf of the American Bankers Association, pp. 124-84, esp. pp. 127-28, 130, 132-34, 137-38; and of Alvin Wiese, of the National Consumer Finance Association, pp. 139-84, esp. 141-42, 167-68, 176-80). This Senate hearing in the 94th Congress was the only one conducted by that body preceding the introduction of the final version of S.B. 2266 in the 95th Congress.[13]
 
 
 58
 With regard to Sec. 1322 of the H.R. 8200, the Senate bill made only one amendment to subsection (b). It amended subsection (b)(2), which authorized a plan to "modify" the rights of holders of secured claims, to exempt those claims that were "wholly secured by mortgages on real property."[14] The Senate amendment's only purport was to limit the authorization of a plan to "modify" secured debts (reduce installment payments, secured valuation, etc.)--by the Senate bill's amendment, no such modification was to be permitted only for debts wholly secured by real estate mortgages. However, the Senate amendment did not purport to affect the authorization for a plan to cure default-accelerations, Sec. 1322(b)(3), nor did it purport to affect the curing of defaults on long-term debts not provided for or dischargeable by the plan, Sec. 1322(b)(5).[15]
 
 
 59
 The final amendments to H.R. 8200 and S.B. 2266 (the latter being the Senate's amended version of the House bill) were accomplished by a series of agreed-upon floor amendments in both houses, by which differences between the two versions were reconciled and compromised. With regard to Sec. 1322(b)(2), the Senate receded from its position that no "modification" was to be permitted of any mortgage secured by real estate; it instead agreed to a provision that modification was to be barred only as to a claim "secured only by a security interest in real property that is the debtor's principal residence." This limited bar was apparently in response to perceptions, or to suggestions advanced in the legislative hearings, see note 13 supra, that, home-mortgagor lenders, performing a valuable social service through their loans, needed special protection against modification thereof (i.e., reducing installment payments, secured valuations, etc.). Likewise, in an addition that created a potential ambiguity, Sec. 1322(b)(5) (concerning default-cure and maintenance of non-dischargeable long-term loans) was amended to provide that its provisions were unchanged "notwithstanding " Sec. 1322(b)(2) (as thus amended, see above).[16]
 
 
 60
 In context, and as explained by their legislative history, see note 16 supra, the final amendments to subsections (b)(2) and (b)(5) of Sec. 1322, did not, with regard to home mortgages, affect the general provision of Chapter 13, see Sec. 1322(a), that permitted a petitioner's plan to pay from future income over the term of the plan any matured pre-petition obligations, whether secured or unsecured; nor did these amendments intend to affect the authorization for a Chapter 13 plan either (1) to cure any default with regard to debts that were provided for by the plan, Sec. 1322(b)(2), or (2), to cure any default within a reasonable time and to maintain payments upon a non-dischargeable long-term obligation, whether secured or unsecured, Sec. 1322(b)(5).
 
 
 61
 Thus, the bankruptcy court was in error in finding that Sec. 1322(b)(5)'s preface, "notwithstanding paragraph (2)", was a subset of the power to "modify" set forth in (b)(2). As observed in In re Taddeo, supra, 685 F.2d at 27, a "superficial reading of the statute [to that effect] must fail in the light of legislative history and legislative purpose." Rather, "[t]he 'notwithstanding' clause was added to emphasize that defaults in mortgages could be cured notwithstanding Sec. 1322(b)(2)." Id.
 
 IV.
 
 62
 Thus, through its construction of Sec. 1322(b)(2) and (5) that was rejected by In re Taddeo, supra, and now by us, the bankruptcy court erred in finding, based solely upon these provisions, that Grubbs, the present petitioning debtor, could not by his Chapter 13 plan cure a default-acceleration in his home mortgage. As a consequence of this, the bankruptcy court felt that it was unable even to consider approving Grubbs' Chapter 13 plan, under which he would pay all arrearages and matured amounts of his home mortgage over the term of his plan, if his plan was approved by the bankruptcy court.
 
 
 63
 The bankruptcy court was in error, for the reasons previously noted.
 
 
 64
 Additionally, however, we must note that, upon our own examination of the creditor Houston First's second home-lien encumbrance, we note that it was not a long-term mortgage having its last payment (under its non-accelerated terms) to become "due after the date on which the final payment under the plan is due." Secs. 1322(b)(5). Instead, Houston First's loan was secured by a three-year home-mortgage, with the last payment (under its non-accelerated terms) becoming due within the term of the proposed plan. It is thus not a long-term debt within the plan-provision contemplated by Sec. 1322(b)(5).
 
 
 65
 The acceleration triggered by Grubbs' default in payment was thus curable under Sec. 1322(b)(3), rather than (5). While the proposed plan might possibly not be able to "modify" the obligation to pay monthly installment amounts that became due on a home-mortgage subsequent to the filing of the Chapter 13 petition, Sec. 1322(b)(2), it could nevertheless provide for the payment from future income of previously non-accelerated matured amounts that had become due prior to the filing of the Chapter 13 petition, Secs. 1322(a), 1327, 1328(a). (The plan so proposed, of course, must meet other objections and is subject to approval by the bankruptcy court.) Under the pleadings as presented to us, Grubbs' plan proposed by his amended petition intended to do no more.
 
 
 66
 For the reasons earlier noted, neither "the curing" of the default pursuant to the plan on Grubbs' debt to Houston First, as authorized by Sec. 1322(b)(3), nor the plan's provision for payment of the matured amount due on that debt from Grubbs' future income over the life of the plan, as authorized by Sec. 1322(a)(1), may be regarded as proposals to "modify" his home-mortgage indebtedness that are prohibited by Sec. 1322(b)(2).
 
 Conclusion
 
 67
 Accordingly, we REVERSE the judgments of the courts below, and we REMAND for consideration of Grubbs' Chapter 13 plan and of other objections thereto, if renewed by the creditor.
 
 
 68
 REVERSED AND REMANDED.
 
 
 69
 E. GRADY JOLLY, Circuit Judge, with whom GEE, REAVLEY and GARWOOD, Circuit Judges, join, dissenting:
 
 
 70
 I continue to adhere to the holding and reasoning of the panel. With the greatest respect for the majority and for the writing judge, it is nevertheless my belief that the result reached by the en banc court requires it to disregard the plain meaning of words, to twist common rules of grammatical construction, and to fill statutory interstices with judicial legislation. Even though legislative history, carefully picked out, is the principal basis of the argument made by the majority, legislative history can be persuasively cited--as the panel opinion points out--to support the conclusion reached by the court below. In short, the legislative history, viewed as a whole, is anything but conclusive. I would therefore return to the words of the statute, which, if given their usual meaning in context, cannot support the conclusion reached by the majority here.
 
 
 71
 Judge Tate has in truth written a thorough and scholarly opinion which, frankly, is more convincing than the Second Circuit's in In re Taddeo, 685 F.2d 24 (2d Cir.1982). Most of the arguments and points made by the en banc opinion have been addressed by our panel opinion, and I will let the matter rest on what has been said. For me to write more on the subject, which now appears settled by virtue of the majority here and the Second Circuit in In re Taddeo, would be largely repetitious and amount to no more than a Parthian shot.
 
 
 
 [1]
 Section 362 is made applicable to Chapter 13 proceedings by Section 103(a) of the Code. Subsequently, the continuance of the stay pending appeal was conditioned upon Grubbs' payment to Houston First of $368 on the first day of each month. See Sec. 362(d) of the Code
 
 
 [2]
 Bankruptcy Laws Commission's Report, H.R.Doc. 137, 93d Cong., 1st Sess. (1973)
 
 
 [3]
 The second important change is in the treatment of secured creditors. Most often in a consumer case, a secured creditor has a security interest in property that is virtually worthless to anyone but the debtor. The creditor obtains a security interest in all of the debtor's furniture, clothes, cooking utensils, and other personal effects. These items have little or no resale value. They do, however, have a high replacement cost. The mere threat of repossession operates as pressure on the debtor to pay the secured creditor more than he would receive were he actually to repossess and sell the goods
 Current chapter XIII does little to recognize the differences between the true value of the goods and their value as leverage. Proposed chapter 13 instead views the secured creditor debtor relationship as a financial relationship, and not one where extraneous, non-financial pressures should enter. The bill requires the court to value the secured creditor's interest. To the extent of the value of the security interest, he is treated as having a secured claim, entitled to be paid in full under the plan, unless, of course, he accepts less than full payment. To the extent that his claim against the debtor exceeds the value of his collateral, he is treated as having an unsecured claim, and he will receive payment along with all other general unsecured creditors. Of course, the holder of a nonrecourse loan will not have an unsecured claim for the deficiency. This is an important departure from a few misguided decisions under current law, under which a secured creditor with a $2000 secured by household goods worth only $200 is entitled in some cases to his full $2000 claim, in preference to all unsecured creditors.
 H.Rep. 595, 95th Cong., 1st Sess. at 124, U.S.Code Cong. & Admin.News, p. 6085.
 
 
 [4]
 Section 1322(b) provides, in pertinent part, that:
 (b) ... the plan may
 (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims;
 (3) provide for the curing or waiving of any default; ...
 (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;
 * * *
 (10) include any other appropriate provision not inconsistent with this title. (Emphasis added.)
 
 
 [5]
 Sable, A Chapter 13 Debtor's Right to Cure Default Under Section 1322(b): A Problem of Interpretation, 57 Am.Bankr.L.J. 127, 128 (1983); Comment, Accelerated Mortgages: An Unsolved Problem of Interpretation in Chapter 13, 19 Hous.L.Rev. 954, 971 (1982)
 
 
 [6]
 Three distinct lines of authority have developed. One line of cases holds that once a debt is accelerated, the debtor's Chapter 13 right to cure the default is extinguished. See, e.g., In re Williams, 11 B.R. 504 (Bkrtcy.S.D.Tex.1981); In re LaPaglia, 8 B.R. 937 (Bkrtcy.E.D.N.Y.1981). Another line of cases has given the debtor the right to cure pre-petition defaults. See, e.g., In re Taddeo, 685 F.2d 24 (2nd Cir.1982); In re Kokkinis, 22 B.R. 353 (Bkrtcy.N.D.Ill.1982). The third line of cases allows the debtor to cure a default on an accelerated debt unless there has been a judicial decree of foreclosure. See, e.g., In re Pearson, 10 B.R. 189 (Bkrtcy.E.D.N.Y.1981)
 
 
 [7]
 However, we should note that the clause, "on which the last payment is due," can be interpreted, as a matter of preempting federal bankruptcy law, to mean "on which the last payment before acceleration is due." See In re Breuer, 4 B.R. 499, 501 (Bkrtcy.S.D.N.Y.1980), so holding and permitting reinstatement of a long-term mortgage by the payment under the plan of the arrears, notwithstanding a pre-petition acceleration and foreclosure judgment. See also III in text below (legislative history)
 
 
 [8]
 In doing so, the panel found itself in substantial agreement with In re Williams, 11 B.R. 504 (Bkrtcy.S.D.Tex.1981), in which the bankruptcy court reasoned as follows:
 Although Sec. 1322(b)(3) states that any default may be cured or waived, it appears to the court that (b)(3) was not intended to apply where (b)(5) (which also provides that any default may be cured) is applicable. Congress provided in (b)(2) that the rights of holders of claims secured by the debtors' principal residence may not be modified by a plan. Congress further provided an exception to (b)(2) in (b)(5): a default may be cured within a reasonable time if the last payment is due after the last plan payment is due. It is not literally possible for both (b)(3) and (b)(5) to be applicable in this instance--either the debtors may cure any defaults on the debts on their home or they can cure those defaults only if the last payment is due after the final plan payment is due. Since (b)(5) makes specific reference to (b)(2), the court believes that Congress intended the "cure" provision of (b)(5) rather than the "cure" provision of (b)(3) to apply to claims secured only by a security interest in real property that is the debtor's principal residence.
 Id. at 506.
 
 
 [9]
 To permit, for Chapter 13 purposes, the variations of the laws of the different states to govern the effect of an acceleration and its curability, would be to defeat one of Congress's important purposes, in exercising its pre-emptive bankruptcy powers under the federal constitution, to provide by Chapter 13 a uniform national remedy (see II supra ) by which to adjust the debts of individuals with regular incomes as an alternative to their being forced to undergo liquidating bankruptcy. H.Rep. No. 595, 95th Cong., 1st Sess. 4-5, 116-21 (1977); 5 Collier on Bankruptcy, p 1300.01 (5th ed. 1983). Along with the Taddeo panel, "[w]e do not believe that Congress labored for five years over this controversial question only to remit consumer debtors--intended to be primary beneficiaries of the new Code--to the harsher mercies of state law." 685 F.2d at 25
 For a discussion (before the appellate decision in Taddeo, supra ) of variations in state-law acceleration, cure, and reinstatement provisions, and their potential differing effects on the application of Section 1332(b) of the Code, see Comment, Accelerated Mortgages: An Unsolved Problem of Interpretation in Chapter 13, 19 Hous.L.Rev. 951 (1982).
 
 
 [10]
 Sable, A Chapter 13 Debtor's Right to Cure Default Under Section 1322(b): A Problem of Interpretation, 57 Am.Bankr.L.J. 127, 139-40 (1983); Comment, Home Foreclosures Under Chapter 13 of the Bankruptcy Reform Act, 30 U.C.L.A.L.Rev. 637, 658-665 (1983); Comment, Chapter 13 Bankruptcy: When May a Mortgage Debtor Cure the Accelerated Mortgage Debt Using Section 1322(b)(5)?, 8 U.Dayton L.Rev. 109, 121-25 (1982); Note, 52 U.Cin.L.Rev. 196, 206-07 (1983)
 
 
 [11]
 The committee commentary with regard thereto stated in full:
 Subsection (b) lists the provisions the plan is permitted to contain. The plan may designate a class or classes of unsecured claims, other than priority claims, subject to the provisions of section 1122, relating to classification of claims. The plan may modify the rights of holders of secured claims or of holders of unsecured claims. It may provide for the curing or waiving of any default. The plan may provide for payments on unsecured claims to be made concurrently with payments on secured claims or priority claims (which are unsecured claims).
 Paragraph (5) concerns long-term debt, such as mortgage debt. It permits the plan to provide for the curing any default within a reasonable time, and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.
 * * *
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 429 (1977), U.S.Code Cong. & Admin.News, p. 6384.
 
 
 [12]
 As stated in United Companies Financial Corp. v. Brantley, 6 B.R. 178, 190 (Bkrtcy.N.D.Fla.1980):
 Section 1322(b)(5) is a statutory codification of the practice developed under former Chapters XI and XIII wherein the injunctive power of Sec. 2a(15) was sometimes utilized not to modify the rights of a creditor but to postpone his remedies upon reasonable and equitable terms and conditions in aid of a worthy rehabilitation plan. See, e.g., Hallenbeck v. Penn Mutual Life Insurance Co., 323 F.2d 566 (4th Cir.1963); In re Garrett, 203 F.Supp. 459 (N.D.Ala.1962).
 See also In re Taddeo, 685 F.2d 24, 29 n. 7 (2d Cir.1982).
 
 
 [13]
 At the Senate hearings held during the next or the 95th Congress, after the introduction of S.B. 2266, the secured creditor advocates advanced only similar objections to the provisions at issue. Hearings Before the Subcommittee on Improvements of the Judicial Machinery of the Senate Committee on the Judiciary, 95th Cong., 1st Sess. (1977) (pp. 652-53 (Wiese), 703, 707, 714-15 (discouragement of savings and loan associations making home loans), 719-21 (Kulik, National Association of Real Estate Investment Trusts))
 
 
 [14]
 Section 1322(b)(2), as amended by S.B.2266, thus provided (Senate amendment italicized):
 (2) modify the rights of holders of secured claims (other than claims wholly secured by mortgages on real property ) or of holders of unsecured claims;
 The only other Senate amendment to Sec. 1322 was to reduce the maximum extended period provided by Sec. 1322(c) for a plan from five to four years. Section 1322(c) as finally enacted retained the House version, by which the plan could not provide for a payment period exceeding three years, unless the court for cause approved a longer period, not to exceed five years in all.
 
 
 [15]
 The Senate committee report explaining Sec. 1322(b) provided, in full:
 Subsection (b) permits a chapter 13 plan to (1) divide unsecured claims not entitled to priority under section 507 into classes in the manner authorized for chapter 11 claims; (2) modify the rights of holders of secured and unsecured claims, except claims wholly secured by real estate mortgages; (3) cure or waive any default; (4) propose payments on unsecured claims concurrently with payments on any secured claim or any other class of unsecured claims; (5) provide for curing any default on any secured or unsecured claim on which the final payment is due after the proposed final payment under the plan; (6) provide for payment of any allowed postpetition claim; (7) assume or reject any previously unrejected executory contract or unexpired lease of the debtor; (8) propose the payment of all or any part of any claim from property of the estate or of the debtor; (9) provide for the vesting of property of the estate; and (10) include any other provision not inconsistent with other provisions of title 11.
 S.Rep. No. 989, 95th Cong., 2d Sess. 141 (1978), U.S.Code Cong. & Admin.News, p. 5927.
 
 
 [16]
 Thus, as finally enacted, Sec. 1322(b)(2) and (5) provided (amendments italicized):
 (2) modify the rights of holders of secured claims other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims;
 * * *
 (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; * * *;
 The floor-statements explaining these amendments are as follows:
 Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment.
 
 
 [124]
 Cong.Rec.H. 11,106 (Sept. 28, 1978); S 17,423 (Oct. 6, 1978)
 It is to be noted that Sec. 1322(b)(3), authorizing a plan to "provide for the curing or waiving of any default," i.e., in a debt provided for by the plan (in the light of the previous statutory history), was retained unchanged as proposed in both House and Senate bills.