**In re Victor and Linda WILSON, Debtors.**

**No. 04 B 26948.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Feb. 25, 2005.

Colin Banyon, Jason Blust, Macey & Chern, Chicago, IL, for Debtors.

A. Stewart Chapman, Dana O'Brien, Pierce & Associates P.C., Chicago, IL, for GMAC Mortgage Corporation.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, Bankruptcy Judge.

Creditor GMAC Mortgage Corporation objected to confirmation of the Wilsons' Chapter 13 plan, arguing that it impermissibly modifies GMAC's rights to administer and enforce the terms of its home mortgage loan in violation of § 1322(b)(2) of the Bankruptcy Code. The Wilsons used the Chapter 13 Model Plan, which is required of all Chapter 13 debtors in the Northern District of Illinois ("Model Plan"). GMAC's objections are not concerned with provisions unique to the Wilsons' plan but are limited to certain stan-

dard provisions contained in every Model Plan. The Wilsons assert that their plan should be confirmed, since the Model Plan does not modify GMAC's rights, but instead provides a forum and procedure for adjudicating those rights. The court agrees and overrules GMAC's objection.

## BACKGROUND

The Wilsons filed for relief under Chapter 13 on July 21, 2004, and filed their Chapter 13 plan the same day. GMAC filed an objection to confirmation shortly thereafter, based partly on the scheduled amount of its arrearage, and the Wilsons filed an amended plan on August 18, 2004. The amended plan uses the Chapter 13 Model Plan that was adopted by the Northern District of Illinois on July 16, 2004, and became mandatory on August 16, 2004, pursuant to Local Bankruptcy Rule 3015–1. *See* New Chapter 13 Model Plan, *at http://www.ilnb.uscourts.gov/Announcements* (July 16, 2004).

The Wilsons scheduled GMAC Mortgage with a first priority lien on their residence at 10831 South Parnell, Chicago. According to their amended plan, they intend to make their regular monthly mortgage payments of $1,375.00 to GMAC outside the plan, as well as paying off an arrearage of $17,088.06 (the amount in GMAC's original objection to confirmation) through the plan. GMAC filed a new objection to confirmation on September 20, and a brief in support of the objection on October 25, 2004. Since the arrearage amount was corrected, GMAC's new objection only involves the standard language in the Model Plan.

## LEGAL DISCUSSION

Pursuant to 11 U.S.C. § 1322(b)(2), a Chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ...". In other words, residential mortgage holders enjoy a position that other secured creditors do not, in that their rights cannot be modified through a Chapter 13 plan. A mortgagee holds certain bargained-for rights under the mortgage, and those rights are protected from modification under § 1322(b)(2). *Nobelman v. American Sav. Bank*, 508 U.S. 324, 329–330, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

Confirmation of the Wilsons' plan turns on whether the Model Plan provisions are prohibited modifications of GMAC's rights in violation of § 1322(b)(2) or simply a local procedure for adjudicating disputes involving those rights. This court holds that the Model Plan does not alter GMAC's rights. The challenged language from the Model Plan is as follows:

B.   General Provisions....

    2.   The rights of holders of claims secured by a mortgage on real property of the debtor, proposed to be cured in Paragraph 4 of Section E of this plan, including the right to reimbursement for costs of collection and other payment obligations of the debtor accruing after the filing of this bankruptcy case, shall be modified only to the following extent:

    (a) *Prepetition defaults.* If the debtor pays the cure amount specified in Paragraph 4 of Section E, while timely making all required postpetition payments, the mortgage will be reinstated according to its original terms, extinguishing any right of the holder to recover any amount alleged to have arisen prior to the filing of the petition.

GMAC further argues that the following paragraphs, which are also contained within Paragraph B(2) of the Model Plan, im-

permissibly modify its rights in servicing the loan for accounting and reimbursement, and potentially waive properly assessed post petition servicing fees and costs:

(b) *Postpetition defaults.* Within 30 days of issuing the final payment of the cure amount specified in Paragraph 4 of Section E, the standing trustee shall serve upon the holder, the debtor, and any attorney for the debtor a notice stating (1) that the cure amount has been paid, satisfying all prepetition mortgage obligations of the debtor, (2) that the holder is required to treat the mortgage as reinstated and fully current unless the debtor has failed to make timely payments of postpetition obligations, (3) that if the debtor has failed to make timely payments of any postpetition obligations, the holder is required to itemize all outstanding payment obligations as of the date of the notice, and file a statement of these obligations with the court, giving notice to the standing trustee, the debtor, and any attorney for the debtor, within 60 days of service of the notice from the trustee (or such longer time as the court may order), (4) that if the holder fails to file and serve a statement of outstanding obligations within the required time, the holder is required to treat the mortgage as reinstated according to its original terms, fully current as of the date of the trustee's notice, and (5) that if the holder does serve a statement of outstanding obligations within the required time, the debtor may (i) within 30 days of service of the statement, challenge the accuracy of the statement by motion filed with the court, on notice to the holder and the standing trustee, with the court resolving the challenge as a contested matter, or (ii) propose a modified plan to provide for payment of additional amounts that the debtor acknowledges or the court determines to be due. To the extent that amounts set forth on a timely filed statement of outstanding obligations are not determined by the court to be invalid or are not paid by the debtor through a modified plan, the right of the holder to collect these amounts will be unaffected. No liability shall result from any nonwillful failure of the trustee to serve the notice required by this subparagraph.

(c) *Costs of collection.* Costs of collection, including attorneys' fees, incurred by the holder after the filing of this bankruptcy case and before the final payment of the cure amount specified in Paragraph 4 of Section E may be added to that cure amount pursuant to order of the court on motion of the holder. Otherwise, any such costs of collection shall be claimed pursuant to subparagraph (b) above.

In response, the Wilsons point out that the purpose of paragraph B(2), and specifically subparagraphs (b) and (c), is to provide a mechanism for resolving disputes over the accrual of postpetition charges assessed by a mortgage holder while the Chapter 13 case is pending. Without such a procedure, the lender may not inform the debtor of the charges, in order to avoid violating the automatic stay. The result is that the debtor completes his plan, receives his discharge, and is then served

with a foreclosure complaint based on postpetition charges to his account of which he had no knowledge. This problem was acknowledged in a well known treatise on Chapter 13 law:

> [p]ostconfirmation late charges, escrow account shortfalls, force-written insurance premiums and other contract charges that accrue under a mortgage during a Chapter 13 case don't go away at discharge. When the debtor gets a notice of foreclosure almost simultaneously with the discharge, counsel has a tough task to explain why the years of hard work in the Chapter 13 case did not produce the advertised relief.

Hon. Keith M. Lundin, 2 Chapter 13 Bankruptcy § 131.1 (3rd ed. 2000 & Supp. 2004) (footnote omitted).

## I. The Model Plan's Procedures for Resolving Disputes Between Debtor and Home Lender Do Not Modify GMAC's Rights.

The Model Plan provisions were adopted to reduce the number of foreclosures filed against debtors immediately following the conclusion of their Chapter 13 case. The Plan's language was crafted with input from both creditor and debtor attorneys practicing in Chapter 13 cases in this district. Under the Model Plan, debtors who have timely made all required postpetition payments can be assured that they have paid all arrearages and accrued charges, and will achieve a fresh start with plan completion and their Chapter 13 discharge.

That is all that Paragraph B(2) of the Chapter 13 Model Plan purports to do—provide a mechanism for resolving disagreements as to a default or amounts owed that accrued during the Chapter 13 case. By providing a procedure for the parties to use to definitively ascertain what a debtor owes his home lender, the Model Plan does not modify a mortgage holder's rights in violation of § 1322(b)(2). Instead, it merely provides a framework within which to enforce those rights according to the loan document terms. Subparagraph (b) does *not* modify the mortgage holder's right to charge late fees, attorneys' fees, or assess other collection costs as provided in the contractual agreement between the creditor and the debtor. Instead, under the Model Plan, once the Chapter 13 trustee distributes the final payment of the arrearage cure amount, he must notify the mortgage holder that any fees and costs permitted under the loan documents, which accrued during the Chapter 13 case, must be itemized within 60 days or forfeited.

Such a procedure is analogous to a state court enforcing a foreclosure judgment in accordance with the terms of the mortgage loan. Once the lender proves up amounts due under the mortgage and loan documents, those amounts are contained within the judgment of foreclosure. The courts decide and finalize the dispute between the mortgagor and mortgagee. For example, under claim preclusion principles, the lender could not collect more than the deficiency amount contained in a state court foreclosure judgment order. If the lender omitted certain items from prove up and a final order was entered without such amounts, the lender could not collect those additional amounts in the future. This result is not a "modification" of that lender's rights, but instead is the procedural effect of a final judgment order.

GMAC cites *Singer v. Pierce & Associates, P.C.*, 383 F.3d 596 (7th Cir.2004), for the proposition that the contractual agreement between the debtor and creditor determines the amount of attorneys' fees, not a prior court order. By contrast, argues GMAC, the Model Plan requires a court order before attorneys' fees may be added

to the mortgage, in contravention of Seventh Circuit precedent and Illinois state law.

The only issue before the court in *Singer* was "whether Singer stated a Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ('FDCPA'), claim against Pierce for its attempts to collect $2574 in attorneys' fees when the Illinois [mortgage foreclosure] court had designated only $1100 in attorneys' fees in a *vacated* interlocutory order." *Id.* at 597 (emphasis added). The Seventh Circuit held that because the state court dismissed the foreclosure proceedings following payment in full, and vacated its prior order awarding fees, the mortgagee "was not bound by or limited to the court's vacated attorneys' fees award …". *Id.* at 598. However, "[h]ad the foreclosure proceedings continued, Wells Fargo could only have collected attorneys' fees authorized by the court." *Id.* In other words, the Seventh Circuit acknowledges that where a contractual agreement provides for the recovery of attorneys' fees, a court may fix the amount of fees at a figure less than that requested by the attorney; it is only when that order is vacated that it is not binding. While a court order may not be "a prerequisite to the enforcement of a valid contract provision allowing for attorneys' fees," *id.* (quoting the lower court decision), neither is a court prohibited from fixing the amount of attorneys' fees even when a contractual agreement provides for the recovery of such fees. It is *proper for* the Chapter 13 Model Plan to provide this mechanism for fixing the amount of the mortgagee's post-petition attorneys' fees, and by doing so it does not contravene the Seventh Circuit's decision in *Singer*.

The Model Plan simply discourages a home lender from surprising a debtor with a foreclosure action immediately following the Chapter 13 case based on a default that existed at or before the end of the bankruptcy. What appears to trouble GMAC is that the Model Plan affirms that the bankruptcy court—not GMAC—is the adjudicator of disputes under the loan documents during the Chapter 13 case.

## II. The Model Plan's Provisions Are Also Permissible Under § 1322(b)(5), Which Allows a Plan to Cure Any Default on a Home Loan.

■ Additionally, even if the Model Plan's time limitation for claiming postpetition defaults "affected" GMAC's rights, which this court does not believe is the case, such a constraint is a permissible one. This is because § 1322(b)(5) of the bankruptcy code permits a debtor to cure defaults under a mortgage, notwithstanding § 1322(b)(2):

This is not to say, of course, that the contractual rights of a home mortgage lender are unaffected by the mortgagor's Chapter 13 bankruptcy. The lender's power to enforce its rights—and, in particular, its right to foreclose on the property in the event of default—is checked by the Bankruptcy Code's automatic stay provision. 11 U.S.C. § 362. *See United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 369–370, 108 S.Ct. 626, 629–630, 98 L.Ed.2d 740 (1988). In addition, § 1322(b)(5) permits the debtor to cure prepetition defaults on a home mortgage by paying off arrearages over the life of the plan "notwithstanding" the exception in § 1322(b)(2).[4] These statutory limitations on the lender's rights, however, are independent of the debtor's plan or otherwise outside § 1322(b)(2)'s prohibition.

---

4. Under § 1322(b)(5), the plan may, "notwithstanding paragraph (2) of this subsection, provide for the curing of *any* default

within a reasonable time and maintenance of payments while the case is pending on any ... secured claim on which the last payment is due after the date on which the final payment under the plan is due."

*Nobelman,* 508 U.S. at 330, 113 S.Ct. 2106 (emphasis added). *See also In re Garcia,* 276 B.R. 627, 634 (Bankr.D.Ariz.2002) ("The right to cure is not limited to cures that are not deemed to be modifications when a principal residence is involved. 'Cure' and 'modification' are distinct concepts that do not overlap.").

Nevertheless, GMAC cites *Grubbs v. Houston First American Sav. Ass'n,* 730 F.2d 236 (5th Cir.1984), in support of its argument that by requiring a mortgagee to obtain a court order before adding post petition charges to the loan, the Model Plan reduces the size and varies the time of payments. In *Grubbs,* the panel looked back to the legislative history when considering the intent behind § 1322(b)(5): "[T]he report emphasized that 'this clause does not authorize reduction of the size or varying of the time of installment payments ...'." 730 F.2d at 244 (quoting Bankruptcy Laws Commission's Report, H.R. Doc. 137, pt. 2, 93rd Cong., 1st Sess. 205 (1973)). This is the section of the report that GMAC quoted. What GMAC did not cite followed just a few sentences later:

> But while the debtor is operating under the plan, he may be able to employ the authorization given under this clause to preserve his equity in his home and to keep current on long-term debt *by provisions in the plan for curing defaults and maintaining payments.*

*Id.* (emphasis added).

The Seventh Circuit agreed with *Grubbs* "that the purpose of the 'notwithstanding' clause in (b)(5) was to emphasize that defaults in residential mortgages could be cured notwithstanding (b)(2)." *Matter of*

*Clark,* 738 F.2d 869, 874 (7th Cir.1984) (citations omitted).

The purpose of § 1322(b)(5) is to allow: the debtor ... during the term of the plan [to] fully pay off arrearages that had matured prior to the filing of his Chapter 13 petition, along with his maintaining payments coming due during the term of the plan—at the conclusion of which, if all payments were made, the debtor would owe the unpaid balance of a long-term debt, payable in installments according to its original terms. This concept was the basis of § 1322(b)(5), a provision that, as a primary purpose, was designed to enable a debtor to preserve his equity in his mortgaged home and to provide a means to restore and maintain his currency on a long-term debt not otherwise provided by the plan.

*Grubbs,* 730 F.2d at 244–245.

Under the Model Plan, the mortgage is not reinstated according to its original terms unless the Chapter 13 debtor pays the specified cure amount. Second, subparagraph (b) provides the debtor with certainty regarding the amount, if any, of postpetition defaults. It does not reduce the size or timing of installment payments under the plan or under the mortgage; instead, it is a provision that provides a mechanism for the debtor to cure any defaults, as plans may do pursuant to § 1322(b)(5).

As Lundin acknowledges, "[t]he mechanics of curing postpetition defaults vary among jurisdictions." 2 Chapter 13 Bankruptcy § 131.1. He suggests that "[l]ate charges or defaults that occur after confirmation could become part of the arrearage claim through postconfirmation modification of the plan," *id.* (footnote omitted), which is similar to what the Model Plan anticipates. Subparagraph (b) provides that if the mortgage holder serves a state-

ment of outstanding obligations, the debtor can challenge it in court as a contested matter, or "propose a modified plan to provide for payment of additional amounts that the debtor acknowledges or the court determines to be due." The majority of courts agree that since § 1322(b)(5) allows the cure of *any* default, a debtor can modify his plan under § 1329 to cure postconfirmation defaults, so long as the curing is done within a reasonable period of time and while current payments are being maintained. *See Green Tree Acceptance, Inc. v. Hoggle,* 12 F.3d 1008 (11th Cir. 1994); *Mendoza v. Temple–Inland Mortgage Corp.,* 111 F.3d 1264, 1268 (5th Cir. 1997) (recognizing a split of authority, and following *Hoggle,* the only Circuit-level decision); *In re Steele,* 182 B.R. 284 (Bankr. W.D.Okla.1995) (since a debtor can modify a plan after confirmation to provide for postpetition arrearages, the original plan can contemplate and satisfy some postpetition arrearages). *See also Garcia,* 276 B.R. at 636–637 (footnotes omitted):

> For two reasons, the language of the Code does not support any argument that certain defaults are incurable. First, both (b)(3) and (b)(5) specifically provide for the "curing of *any* default" (emphasis added). That language certainly implies that all defaults may be cured, not just certain kinds. Indeed, the Ninth Circuit relied on precisely that language to reject an argument that a particular kind of default was incurable under the identical language applicable to Chapter 11 plans, in § 1123(a)(5)(G): "Section 1123 speaks of 'any default'.... The natural reading of these sections is that plans may cure all defaults....". The Fifth and Eleventh Circuits have relied on that language to conclude that postconfirmation defaults may be cured, and the leading authoritative treatise on Chapter 13 concurs that "there is logic to this view."

Based on the foregoing analysis, plan provisions that supply a way to cure postpetition defaults under § 1322(b)(5) do not violate § 1322(b)(2). None of the provisions modify the amount or timing of payments under the loan documents; they simply set up a method of adjudicating the postpetition amounts due under the loan documents if there is a dispute and a method to cure those defaults. The Model Plan provisions expressly preserve GMAC's rights:

> To the extent that amounts set forth on a timely filed statement of outstanding obligations are not determined by the court to be invalid or are not paid by the debtor through a modified plan, the right of the holder to collect these amounts will be unaffected.

*See* Model Plan Paragraph B(2)(b)(ii).

## CONCLUSION

The Chapter 13 Model Plan affords a mechanism for debtors and lenders to achieve certainty regarding the amount and payment of postpetition arrearages, fees, and costs of collection. It does not change the original contract terms of the loan, the timing, or the amount of payments but directs disputes about these issues to be resolved in the bankruptcy court. Moreover, since the Code allows Chapter 13 plans to cure any default, even if the Model Plan's provisions "affected" a debtor's obligations to a home lender, the effect is nothing more than the permissible curing of postpetition defaults. Accordingly, the Model Plan does not impermissibly modify GMAC's rights, and the objection to confirmation is overruled.