FARRIS, Circuit Judge:
Robert Seidel and Charlotte Baggerman purchased a home. A promissory note secured by a mortgage was given in partial payment. The note provided for interest-only payments for a period of three years, at which time the principal in full would come due. The purchasers defaulted when the principal came due, and the sellers commenced foreclosure proceedings in state court. Prior to final judgment of foreclosure and sale, the purchasers filed a Chapter 13 petition and plan under the Bankruptcy Code. Under the plan the purchas *1383 ers proposed to pay the debt then in default in sixty monthly installments, culminating in a final balloon payment of $4,000. The Bankruptcy Court for the District of Oregon refused to confirm the proposed plan because the plan attempted to “modify” the rights of creditors in violation of 11 U.S.C. § 1322(b)(2). In re Seidel, 31 B.R. 262 (Bankr.D.Or.1983).
On review, the district court considered the statute and its legislative history and concluded that a debtor may not delay payment of an already-matured debt by filing a Chapter 13 petition. The purchasers appealed.
We have jurisdiction over the timely filed appeal under 28 U.S.C. § 1291. The single issue on appeal — can a debtor use a Chapter 13 petition to delay payment of an unaccelerated debt that matured prior to the filing of the petition? — is a question of law subject to de novo review. See United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc), cert. denied, — U.S. —, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
This issue is one of first impression in this circuit; similar but not identical issues have been considered by other circuit courts. See In re Clark, 738 F.2d 869 (7th Cir.1984); Grubbs v. Houston First Amer. Sav. Ass’n, 730 F.2d 236 (5th Cir.1984) (en banc); In re Taddeo, 685 F.2d 24 (2d Cir.1982). In each of these other cases, however, the debt came due before the filing of the Chapter 13 petition only because a creditor had accelerated the entire debt after a default in installment payments. These cases are therefore distinguishable. The language and legislative history of Chapter 13 demonstrate congressional intent to protect home mortgage lenders. We affirm.
When a creditor is secured only by the debtor’s principal residence, a Chapter 13 plan is barred from “modifying” the rights of the secured creditor. 11 U.S.C. § 1322(b)(2). Seidel’s plan proposes to pay off a note, which had already reached its due date before he filed for bankruptcy, in installments over the next five years with a balloon payment at the end of that period. His plan therefore affects the rights of the creditor who holds both the note and the security interest in Seidel’s home mortgage. We must decide whether the plan will so affect the creditor’s rights that it amounts to “modifying” them, in violation of § 1322(b)(2).
In deciding whether a plan rises to the level of “modifying” rights we first consider whether that plan merely “cures” a default. Section 1322(b)(3) authorizes “the curing or waiving of any default,” while section 1322(b)(5) authorizes the curing of a default when “the last payment is due after the date on which the final payment under the plan is due.” We hold that Seidel’s plan “modifies” his creditor’s rights in violation of subsection b(2), and that the “cure” provisions of subsections b(3) and b(5) are inapplicable when a debt has reached its maturity date in the absence of acceleration, prior to the filing of the Chapter 13 petition.
I. Delay in payment of an already-matured debt is a “modification.”
The distinctive feature of Seidel’s plan is that it extends the time for complete payment of a note far beyond the time originally contemplated by the parties. In contrast to the bulk of section 1322(b) cases, in which a creditor has exercised its power to accelerate payment before a debt came naturally due, this case involves a note which had already fully matured and was immediately due and payable even before the plan was filed. Furthermore, Seidel proposes to delay payment of the matured debt over the next five years — the maximum period allowable under the statute, and only permitted when the court is convinced that unusual circumstances exist, 11 U.S.C. § 1322(c) — with a large balloon payment postponed until the end of that period.
When applying section 1322(b) to already-matured debts, courts have held that “by in effect creating a new payment schedule, such action would clearly involve ‘modifying’ the rights of the mortgagee.” In re Maloney, 36 B.R. 876, 878 (Bankr.D. *1384 N.H.1984); see In re Fontaine, 27 B.R. 614 (Bankr.App. 9th Cir.1982); see also In re Gwinn, 34 B.R. 936, 944 (Bankr.S.D.Ohio 1983) (an extension of the period to make payments is a “basic or important change” that would modify creditors’ rights in violation of subsection b(2)). Thus, when a plan would extend the time for payment beyond the time originally contemplated by the creditor, the creditor’s rights are being “modified” and the plan should not be confirmed.
Other courts have held that no alteration of the creditor’s rights will be considered a “modification,” so long as a creditor receives regular payments and ultimately receives “100% of what he is due plus accruing interest up until the time of payment.” In re McSorley, 24 B.R. 795, 798 (Bankr.D.N.J.1982); In re Simpkins, 16 B.R. 956, 964 (Bankr.E.D.Tenn.1982). These cases have upheld plans for debts naturally maturing before filing of the Chapter 13 petition, see In re McSorley, and for debts maturing after filing but before confirmation of the plan, see In re Simpkins. So long as those plans gave the creditor the amount of his claim plus interest, and maintained a schedule of regular payments, they have been confirmed — even though the debtor ended up receiving money after the time originally contemplated by the debt contract.
In making our own determination of the meaning of the word “modification” in subsection b(2), we must look to the “plain meaning” rule. “The starting point in every case involving construction of a statute is the language itself,” Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring), and while the circumstances of the statute’s enactment may persuade us that “Congress did not intend words of common meaning to have their literal effect,” Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981), the “plain meaning” of the language is “the primary, and ordinarily the most reliable, source of interpreting the meaning” of a statute. Id. at 266 n. 9, 101 S.Ct. at 1678 n. 9 (quoting Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). In our view, the plain meaning of the word “modification” in subsection b(2) must bar Seidel’s plan. By postponing payment of the debt beyond the time originally contemplated by the parties to the contract, his plan clearly amounts to a unilateral “modification” of the original debt contract, as that word is ordinarily used.
Instead of viewing the power to modify as “the alteration ... of [any] provisions of the secured creditors’ contract,” Bankruptcy Laws Commission’s Report, H.R.Doc. No. 137, pt. 2, 93rd Cong., 1st Sess. 205 (1973), reprinted in Collier on Bankruptcy App. 2 at 205, however, some courts suggest that modification means only the altering of the system of regular installment payments originally set up by the debt contract. See Grubbs, 730 F.2d at 245; In re McSorley, 24 B.R. at 798; In re Simpkins, 16 B.R. at 964; accord, In re Clark, 738 F.2d at 873-74; In re Carr, 36 B.R. 381, 383-84 (Bankr.N.D.Ga.1984). So long as a Chapter 13 plan maintains regular installment payments, these courts hold, the plan is not “modifying” creditors’ rights, and it can be confirmed — even though the creditor will not receive these installment payments until long after the debt naturally matured.
The only support for finding that subsection b(2) is restricted to barring home mortgagors from reducing regular installment payments is the fact that creditor lobbyists were especially fearful that the power of modification might authorize debtors to reduce the amount of installment payments. Hearings Before the Subcommittee on Improvements of the Judicial Machinery of the Senate Committee on Judiciary, 94th Cong., 1st Sess. 130 (1975) (Statement of Walter Vaughan on behalf of the American Bankers Association and Consumer Bankers Association). Just because creditors perceived the power to modify as including the power to reduce installment payments, however, does not mean that *1385 Congress intended the power of modification to be restricted to reducing the amount of installment payments. Instead, the “plain meaning” rule suggests that Congress contemplated a broader, natural meaning for the power to modify — including, among other things, the power to delay payments on an already-matured debt. “Very strong” evidence or explicit language from legislative history is necessary to overcome the plain meaning naturally to be drawn from the language of the statute. See Tulalip Tribes of Washington v. FERC, 732 F.2d 1451, 1455 (9th Cir.1984); Heppner v. Alyeska Pipeline Service Co., 665 F.2d 868, 873 (9th Cir.1981).
In defining “modify,” courts have also invoked the general legislative purpose of allowing a debtor to preserve his home. In re McSorley, 24 B.R. at 798; In re Simpkins, 16 B.R. at 961-63. To further this legislative purpose, these courts have upheld plans that delayed the creditor’s right to receive already-due payments, despite the apparent ban on modification of home mortgagees’ rights in subsection b(2).
In addition to the general legislative purpose, however, we must also consider contrary legislative intent. In the specific context of subsection b(2), an amendment was added to protect home lenders, rather than home owners, by prohibiting home owners from modifying debts wholly secured by home mortgages. Grubbs, 730 F.2d at 245; Matter of LaPaglia, 8 B.R. 937, 940 (Bankr.E.D.N.Y.1981); United Companies Financial Corp. v. Brantley, 6 B.R. 178, 189 (Bankr.N.D.Fla.1980). This deliberate alteration of the statute’s general protection of the debtor is a more precise barometer of congressional intent in this particular context. It indicates here that a debtor should not be able to use section 1322(b) to delay payment of a debt which has already come naturally due.
We note that the Fifth Circuit, sitting en banc, found that subsection (b)(2) was not intended to limit “the general provisions of Chapter 13, see § 1322(a), that permitted a petitioner’s plan to pay from future income over the term of the plan any matured pre-petition obligations.” Grubbs, 730 F.2d at 246. Reversing its prior decision by a less than unanimous majority, the court held that subsection (b)(2) was only intended to ensure that a plan preserved the size and periodicity of the monthly payments originally contemplated under the terms of the debt. So long as these aspects were maintained, a plan could work any other change in the creditor’s rights — including delaying tender of those payments for years after the original debt had matured. Id. at 246-47.
The view of the Fifth .Circuit, however, is unduly narrow and contrary to its own analysis of the legislative history. The Fifth Circuit bases its view of subsection b(2) on the fact that the drafters of the earliest version of subsection b(2), the Bankruptcy Laws Commission of 1973, had suggested that the power of “modification” included the power to change “the size and timing of installment payments.” 730 F.2d at 244. But the Fifth Circuit’s own quotation from the Commission’s Report continues, “... as well as the alteration or modification of other provisions of the secured creditors’ contract.” Id. (quoting Bankruptcy Laws Commission’s Report, H.R.Doc. No. 137, pt. 2, 93rd Cong., 1st Sess. 205 (1973), reprinted in Collier on Bankruptcy App. 2 at 205) (emphasis added)). If the Commission’s Report is in fact indicative of subsequent congressional intent, as the Fifth Circuit suggests, any delay in payment — which clearly works an “alteration or modification of other provisions” of the creditor’s contract — must be considered a “modification” within the meaning of subsection b(2)’s ban. Thus, subsection b(2) bars a home mortgagor from delaying payment of an already-matured debt.
Our view is supported by other aspects of the legislative history. Subsection b(2) originally permitted a plan to modify the rights of any creditor. Grubbs, 730 F.2d at 243. When creditors objected, however, the Senate created an exemption that barred modification when claims were “wholly secured by mortgages on real *1386 property.” Id. at 245. This exemption, in turn, was later narrowed to bar modification “only as to a claim ‘secured only by a security interest in real property that is the debtor’s principal residence.’ ” Id. at 246 (emphasis in original). This final amendment was “apparently in response to perceptions ... [that] home-mortgagor lenders, performing a valuable social service through their loans, needed special protection against modification thereof.” Id.
The evolution of subsection b(2), then, shows a deliberate intention by Congress to insulate a certain subset of creditors— those wholly secured by home mortgages— from the general authority to modify which the Fifth Circuit finds in section 1322(a). This exemption is evident from the ordinary reading of the language of subsection b(2).
We do not ignore those circuits that have held that defaults arising out of the acceleration of home mortgage debts can be “cured” under subsections b(3) and b(5). In re Clark, 738 F.2d 869, 874 (7th Cir.1984); Grubbs v. Houston First Amer. Sav. Ass’n, 730 F.2d 236 (5th Cir.1984) (en banc); In re Taddeo, 685 F.2d 24, 28 (2d Cir.1982). These decisions, however, cannot be read to authorize the postponement of payments where a debt has already naturally matured, without acceleration, pri- or to the filing of the Chapter 13 petition.[1]
The decisions rely on the fact that “the plain meaning of ‘cure,’ as used in § 1322(b)(3) and (5), is to remedy or rectify the default and restore matters to the status quo ante.” Clark, 738 F.2d at 872; Taddeo, 685 F.2d at 26-27. When a debt has been accelerated, “cure” therefore results in the reinstatement of the original payment terms of the debt. But when a debt has already naturally matured — as in Seidel’s case — “cure” as defined by these courts cannot aid the debtor, since reinstatement of the original terms of the debt will merely make the debt immediately due and payable. See In re Maloney, 36 B.R. 876, 877 (Bankr,D.N.H.1984). The cure provisions discussed in decisions of other circuits are of no relevance where Seidel is seeking to delay payments on a debt that is immediately due and payable.
II. Subsection b(2) governs a security interest even after it has been converted into a judicial lien.
Seidel notes, however, that subsection 1322(b)(2)’s ban on modification only applies when a claim is “secured only by a security interest in the debtor’s principal residence.” 11 U.S.C. § 1322(b)(2). When the creditor obtained a judgment of foreclosure after Seidel filed his petition, the security interest was converted into a judicial lien. Therefore, Seidel argues, the creditor no longer has a claim “secured only by a security interest,” and the creditor’s rights may be modified under subsection b(2)’s own terms.
A few courts have interpreted the “secured only by a security interest” language as Seidel suggests, permitting modification where the creditor’s security interest was converted into a judicial lien prior to the filing of the debtor’s petition. See e.g., In re Garner, 13 B.R. 799 (Bankr.S.D.N.Y.1981); In re Jordan, 5 B.R. 59, 63 (Bankr. D.N.J.1980). However, the majority of courts have explicitly rejected such a reading of subsection b(2), stating that “the mere fact that the amount of a mortgagee’s lien has been fixed by decree in foreclosure does not deprive the mortgagee of his status as a secured creditor.” In re Collins, 19 B.R. 209, 211 (Bankr.S.D.Fla.1982) ; see In re Ivory, 32 B.R. 788, 793 (Bankr.D.Or.1983); First Fin. Sav. & Loan Assoc. v. Winkler, 29 B.R. 771, 775-76 (D.C.N.D.Ill.1983) (“the important thing is what in fact secures a creditor’s claim, not what legal cloak a creditor may be given to wear”).
These courts have interpreted subsection b(2) in an entirely different manner than Seidel suggests, by looking to the policy behind the language. Congress inserted the “secured only by a security interest” language because it intended to limit the *1387 ban on modification to lenders “engaged only in providing long-term home mortgage financing [,not] lenders primarily engaged in consumer or other areas of financing but who take security interests in a residence or homestead to secure non-home financing debts.” United Companies Fin. Corp. v. Brantley, 6 B.R. 178, 189 (Bankr.N.D.Fla.1980); see In re Banks, 31 B.R. 173, 174 n. 1 (Bankr.N.D.Ala.1982); In re DuPree, 6 B.R. 476, 477 (Bankr.S.D.Ohio 1980). Creditors who happened to take a security interest in the debtor’s home along with a security interest in other property of the debtor were meant to be excluded from the extra protection of subsection b(2)’s ban on modification; their rights could be modified by a Chapter 13 plan. See Note, Saving the Family Homestead: Home Mortgages Under Chapter IS, 43 Ohio St.L.J. 905, 918-19 (1982).
This reading of legislative intent is more plausible than the purely conclusory interpretation Seidel puts forward. If Seidel’s interpretation were adopted, a debtor could “race to the courthouse,” file a Chapter 13 petition, and thereby effectively deter any home mortgagee from enforcing its security interest. Once the petition was filed, a home mortgagee would be deterred from reducing its security interest to a judicial lien, since to do so would be to open itself up to a wholesale modification of its rights under subsection b(2). See In re Ivory, 32 B.R. 788, 793 (Bankr.D.Or.1983). Congress could not have intended, by its ambiguous language, to work such a result when the underlying intent of subsection b(2) was to protect home lenders rather than home owners. Id; see Grubbs, 730 F.2d at 245. We reject Seidel’s interpretation.
We are compelled by the legislative history and the plain meaning of subsection b(2) to uphold Congress’ intention to protect home mortgage lenders. Although Chapter 13 empowers all other types of debtors to “cure” their outstanding debts and make payments out of future income, in the specific context of home mortgage debts, the final amendments to subsection b(2) unequivocally favor the creditor. The district court’s holding that Seidel’s Chapter 13 plan “modifies” his creditors’ rights in violation of 11 U.S.C. § 1322(b)(2) is
AFFIRMED.

. We do not reach the issue decided by the Second, Fifth, and Seventh Circuits, concerning the postponement of payments on a debt which was accelerated prior to the filing of the Chapter 13 petition.