In re Javier A. GARCIA and Adriana M. Garcia, Debtors.

Bank of America, N.A., its successors and/or assigns, Movant,

v.

Javier A. Garcia and Adriana M. Garcia, Debtors; and Russell A. Brown, Chapter 13 Trustee, Respondents.

No. 01–12584–PHX–RJH.

United States Bankruptcy Court, D. Arizona.

April 22, 2002.

Allan D. NewDelman, Phoenix, AZ, for debtors.

Josephine E. Piranio, Moss, Pite & Duncan, L.L.P., El Cajon, CA, for movant.

## OPINION

RANDOLPH J. HAINES, Bankruptcy Judge.

Bank of America, N.A. ("Bank") has moved for summary judgment seeking stay relief to enforce its deed of trust encumbering the home of Chapter 13 Debtors Javier and Adriana Garcia ("Debt-

ors"). The Bank argues that the Debtors are not their borrowers, having acquired the house from the Bank's original borrower without the Bank's knowledge or consent, without assuming the loan and in violation of the due on sale clause in the deed of trust. The Bank argues that such a default cannot be cured, and that permitting the Debtors effectively to assume the Bank's loan would constitute a "modification" of the Bank's security interest in the real property that is the Debtors' principal residence, in violation of Bankruptcy Code § 1322(b)(2).[1]

For the reasons set forth below, the Court concludes the default arising from the due on sale clause can be cured without impermissibly modifying the Bank's lien rights, and therefore denies the Bank's motion for summary judgment.

### Background Facts

The following facts are undisputed.

In 1999, the First Union Mortgage Corporation lent Emmet Murray $72,000 for the purchase of a house, and recorded a deed of trust against the house to secure that debt. The deed of trust contained a due on sale provision in paragraph 17, as follows:

> If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

---

1. Except as otherwise noted, all citations are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et* *seq.*

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

The deed of trust also provided that "The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17."

First Union's note and deed of trust were subsequently assigned to the Bank, and Emmet Murray died. Emmet Murray's Personal Representative, James Murray, sold the house to the Debtors for $109,000, paid by a down payment of $13,500 and subject to the Bank's debt, a second lien in the amount of $18,000, and a carry back lien in favor of James Murray for $6,300. Debtors did not assume the debt to the Bank, nor obtain the Bank's consent to the purchase. The Debtors' Agreement for Sale was promptly and properly recorded in the Official Records of Maricopa County in November, 2000.

Debtors apparently made payment on the Bank's debt for four or five months but then defaulted. In June, 2001, the Bank noticed a trustee's sale for September but the Debtors filed their Chapter 13 case just before that sale could be held. The default giving rise to the notice of trustee's sale was apparently only a payment default, not the default arising from the failure to obtain the Bank's consent to the sale, because the Bank states that it did not know of the sale until July 16, 2001, after its trustee's sale had already been

noticed. There is no allegation that the Bank ever gave anyone the 30-day notice of its exercise of its option to accelerate pursuant to paragraph 17 of the deed of trust. Nor is there any allegation that the Debtors acted in bad faith either in acquiring the property or in filing this Chapter 13 case.

The Bank moved for stay relief and summary judgment, which the Debtors oppose. After briefing, oral argument was heard on February 25, 2002.

### Legal Analysis

Bankruptcy Code § 1322(b)(2) provides that a Chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ...," Code § 1322(b)(3) provides that a plan may "provide for the curing or waiving of any default," and § 1322(b)(5) provides that "notwithstanding paragraph (2) of this subsection, [a plan may] provide for the curing of any default within a reasonable time...." The question here is which of these provisions governs the facts presented.

This raises three basic issues: (1) can a debtor modify or cure the terms of a security instrument to which it is not a party; (2) what distinguishes a permissible "cure" from an impermissible "modification;" and (3) are there defaults that cannot be cured despite the language of §§ 1322(b)(3) & (b)(5)? Before reaching those issues, however, we must first address the effect of the automatic stay.

### Bank Has Not Accelerated On Account of Due on Sale Clause

■ As noted in the facts, the Bank noticed its trustee's sale based only on the payment default, not upon the violation of the due on sale clause. The Bank never exercised its option to accelerate on ac-

count of sale, without its consent, despite having both actual and constructive knowledge of the sale for at least two months prior to the bankruptcy.

Absent stay relief granted pursuant to § 362(d), the automatic stay precludes the Bank from exercising its option to accelerate until the property leaves the estate, the case is closed or dismissed, or the Debtors obtain their discharge, pursuant to § 362(c). In a Chapter 13 case, the discharge is ordinarily granted only after completion of all payments pursuant to a confirmed plan, § 1328(a), which is ordinarily three years but possibly as long as five years. § 1322(d). Consequently, absent stay relief pursuant to § 362(d), if the Debtors confirm a plan and abide by it, they may be entitled to keep their home, subject to the Bank's debt, for three or five years while they make their plan payments. They could do so even without their plan modifying the terms of the Bank's debt or curing the default, so long as they could avoid stay relief.

Because this is summary judgment, the Bank has not made a factual showing that the creditworthiness of the Debtors is so much less than their original borrower's that the Debtors' purchase of the property, without the Bank's consent, constitutes a lack of adequate protection entitling it to stay relief pursuant to § 362(d)(1). That very well may be an issue for another day, after evidentiary hearing.

Instead, the Bank makes a purely legal argument that the violation of its due on sale clause entitles it to stay relief, without tying its argument to any provision of § 362(d).[2] But neither the Bank's motion nor the case law demonstrates that a viola-tion of a due on sale clause by itself conclusively establishes either that the lender is not adequately protected or that the property is not necessary to an effective reorganization. For example, a plan could provide for a sale of the property for cash in an amount sufficient to pay the lender in full and leave additional cash to fund a plan, which could be an effective reorganization without doing any violence to the Bank's due on sale clause. Consequently, as a matter of law, the violation of the Bank's due on sale clause does not per se entitle the Bank to stay relief.

But even though the Bank may not be entitled to stay relief on this motion for summary judgment, this does not resolve all the legal issues on which the parties seek a ruling. The Bank's argument is really directed at what the Debtor's plan can accomplish with respect to the Bank's debt. Moreover, the Debtors' intent here is undoubtedly not simply to keep their house during the term of their plan, but then be faced with a balloon payment of the full debt because the stay has expired and the Bank exercises its option to accelerate. Rather, both parties need to know whether the Debtors can cure the default and maintain regular payments on the debt both during the term of their plan and thereafter until the regular maturity date of the debt.

### A Debtor–Creditor Relationship Exists

■ The first argument the Bank makes is that these Debtors have no right either to cure a default or modify the terms of the Bank's deed of trust because they were never the Bank's borrower. There is not only case law support for this argument, but in fact perhaps the majority

---

2. "Movant seeks relief from the automatic stay on the additional ground that [Debtors] acquired their interest in the property ... through an unauthorized transfer. Since no recognized debtor-creditor relationship exists between Movant and Debtors, the Court must grant Movant's motion." Supplemental Points and Authorities in Support of Bank of America's Motion for In Rem Relief from Automatic Stay at 1–2.

of cases dealing with this issue rely heavily on the fact that the debtor who seeks to cure was never a party to the lender's loan documents. Some courts have held that a lender is entitled to stay relief whenever a debtor has acquired the property securing the lender's debt without the lender's consent and without assuming the loan, even without consideration of a due on sale clause, simply because the court will not "impose" a debtor-creditor relationship on such an unwilling creditor.[3] Others conclude that allowing the debtor to maintain payments on the debt would impermissibly "modify" the lender's rights under the due on sale clause in violation of § 1322(b)(2), and it is a default that cannot be "cured" because the debtor was not the original borrower.[4] But at least one court has rejected the argument based on a lack of a debtor-creditor relationship on the basis of applicable state law,[5] and others have con-

cluded that bankruptcy law recognizes a debtor-creditor relationship in such circumstances and therefore permits a "cure" of the default.[6]

For several reasons, this argument based on an alleged lack of a debtor-creditor relationship does not withstand scrutiny.

■ First, the Bankruptcy Code recognizes a debtor-creditor relationship whenever a creditor holds a claim secured by the debtor's property, even if the debtor has no personal liability. The Supreme Court unequivocally so held in *Johnson v. Home State Bank*.[7] This means that the pre-*Johnson* cases relying on a lack of a debtor-creditor relationship are no longer good law,[8] and the post-*Johnson* cases that persist in relying on the supposed lack of a debtor-creditor relationship are at best highly suspect unless they can successfully

---

3. *E.g., In re Mitchell*, 184 B.R. 757 (Bankr. C.D.Ill.1994) (even though debtor owned the property subject to the mortgage, court would not impose debtor-creditor relationship upon the debtor and the mortgagee).

4. *In re Threats*, 159 B.R. 241, 243 (Bankr. N.D.Ill.1993) ("[Lender's] rights in the property arise and are defined in the mortgage instruments, yet there is no mortgagee-mortgagor relationship to restore. There can therefore be no cure."); *In re Wilkinson*, 99 B.R. 366 (Bankr.N.D.Ohio 1989) (debtors could not cure mortgage arrearage because they were not personally liable on the mortgage granted by their parents); *In re Jones*, 98 B.R. 757 (Bankr.N.D.Ohio 1989) (debtor may not cure because there is no debtor-creditor relationship); *In re Everhart*, 87 B.R. 35 (Bankr.N.D.Ohio 1988) (without personal liability on the note, debtor cannot cure, but under the facts presented equitable considerations required that this debtor be allowed to cure); *Jim Walter Homes, Inc. v. Kelly (In re Kelly)*, 67 B.R. 508 (Bankr.S.D.Miss.1986) (debtor cannot cure because there is no debtor-creditor relationship).

5. *In re Lippolis*, 216 B.R. 378 (Bankr.E.D.Pa. 1997).

6. *In re Trapp*, 260 B.R. 267 (Bankr.D.S.C. 2001); *In re Rutledge*, 208 B.R. 624 (Bankr. E.D.N.Y.1997) (purchaser in violation of due on sale clause may cure, following *Allston*); *In re Allston*, 206 B.R. 297 (Bankr.E.D.N.Y. 1997) (violation of due on sale clause not alone sufficient basis for stay relief, especially where lender accepted payments from debtor for six years, but does not address cure or modification arguments); *Citicorp Mortgage, Inc. v. Lumpkin (In re Lumpkin)*, 144 B.R. 240 (Bankr.D.Conn.1992) (enforcement of due on sale clause prohibited by Garn–St. Germain because debtor acquired residence from her mother).

7. 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

8. "All of the authority the movant has cited to the court was decided prior to *Johnson*, and thus is either simply no longer precedential, or is otherwise inapposite." *Citicorp Mortgage, Inc. v. Lumpkin (In re Lumpkin)*, 144 B.R. 240, 242 (Bankr.D.Conn.1992) (footnote omitted).

distinguish *Johnson*, which none of them does.[9]

Second, Arizona law also recognizes a debtor-creditor relationship here. Subsequent purchasers are entitled to notice of a trustee's sale, Arizona Revised Statutes [10] section 33–809B(2), and the "trustor's successor in interest" is specifically granted that same right as the original trustor to reinstate the deed of trust. A.R.S. § 33–813A. Indeed, the subsequent purchaser is specifically given the right to bring payments current and to "cur[e] all other defaults" equal to the cure rights of the original trustor. Arizona law does not treat the subsequent purchaser as a complete stranger to the deed of trust, with no cure rights, as the Bank's argument here seems to assume. To the contrary, Arizona law expressly invalidates any attempt to prohibit a purchaser from acquiring rights in property subject to a lien, even one with a due on sale provision.[11]

Perhaps the underlying law in states such as Ohio, Illinois and Mississippi [12] gives greater significance to the personal relationship between borrower and lender, which causes bankruptcy courts in those states to refuse to recognize rights acquired by subsequent purchasers without a lender's consent. But that is not the case in Arizona. Here, the original trustor has no more personal liability under a deed of trust against a personal residence than does a nonassuming subsequent purchaser. In both situations, if the property covered by a deed of trust is 2½ acres or less and is utilized as a single or two-family dwelling (regardless of by whom it is so utilized), there is no personal liability of anyone for a deficiency remaining after a trustee's sale. A.R.S. § 33–814G.

Finally, the deed of trust itself creates a debtor-creditor relationship. It provides that it is binding on all successors of both the original lender and the original bor-

---

9. For example, *In re Threats*, 159 B.R. 241 (Bankr.N.D.Ill.1993), acknowledges that the Code's definition of "claim" and the holding of *Johnson* mean that a lender has a claim against a nonassuming purchaser/debtor, *id.* at 242, but nevertheless concludes that it is the lack of a debtor-creditor relationship that precludes a cure: "[A]llowing the Debtors to de-accelerate the loan would eviscerate the due-on-sale clause without the benefit of restoring rights that the Debtors previously held under any agreement.... Fleet's rights in the property arise and are defined in the mortgage instruments, yet there is no mortgagee-mortgagor relationship to restore. There can therefore be no cure." *Id.* at 243. This fails to fully recognize that, as will be seen, a nonassuming purchaser/debtor *does* have prepetition rights under the loan documents. Some courts have limited *Johnson* to its factual context of a "Chapter 20" case, *e.g., Ulster Sav. Bank v. Kizelnik (In re Kizelnik)*, 190 B.R. 171, 179 (Bankr.S.D.N.Y.1995) and *In re Mitchell*, 184 B.R. 757 (Bankr.C.D.Ill.1994), but there is no support in *Johnson* for distinguishing a debt that is nonrecourse due to a previous bankruptcy filing from a debt that is nonrecourse for any other reason.

10. Hereinafter "A.R.S."

11. "Nothing in this article shall be construed to prevent or limit the right of a trustor to transfer his interest in the trust property...." A.R.S. § 33–806.01A. In *Scappaticci v. Southwest Sav. & Loan Ass'n*, 135 Ariz. 456, 457, 662 P.2d 131, 132 (1983), the Arizona Supreme Court affirmed a trial court's summary judgment that exercise of due on sale clauses to exact a higher interest rate "constitutes an unreasonable restraint upon alienation, is void as against public policy, is in violation of Arizona Revised Statutes section 33–806.01, and is unenforceable...." Although the balance of that statute puts limits on the exercise of due on sale clauses to impose fees or increase interest rates on residential property, which was superseded by the Garn–St. Germain Depository Institutions Act of 1982, 12 U.S.C. § 1701j–3, nothing in Garn–St. Germain overrides the prohibition on attempts to preclude the transfer itself.

12. *See* note 4, *supra*.

rower. While that is subject to the terms of paragraph 17 that contains the due on sale clause, nothing in paragraph 17 allows the lender to ignore rights that a debtor has acquired in property subject to the deed of trust. It is also inconsistent with the due-on-sale clause itself. Why make a contract binding on successors only to have it declared an automatic default? It does not, for example, say that the lender can simply ignore the purchaser's acquired property rights and foreclose against the original borrower without notice to the purchaser. To the contrary, it specifically requires notice to the purchaser if the lender elects to exercise its option to accelerate. Thus but for this one additional option to accelerate, all of the terms of the deed of trust remain binding on the lender vis-à-vis the purchaser, and on the purchaser vis-à-vis the lender, which is certainly a debtor-creditor relationship.

For these reasons, this Court concludes that the alleged lack of a debtor-creditor relationship between the Bank and the Debtors has no bearing on the Debtors' rights under § 1322. Under both bankruptcy law and Arizona state law, the subsequent nonassuming purchaser has the same rights as the original trustor; the only change is that the lender has an additional right, an option to accelerate, which in this case has not been exercised.

**Cures Are Not a Subset of Modifications**

For the first 15 years of the Code's history courts debated whether defaults in principal residence mortgages could be cured, or whether such attempted cures would constitute impermissible "modifications" of the lenders' rights. While *Nobelman*[13] may have put that argument to rest in 1993, the present issue will be illuminated by some of the insights obtained before *Nobelman* that seem to have been overlooked in the past decade or so.

After extensive analysis of the purposes of Chapter 13 and the legislative history of each of the particular paragraphs involved, both the Second Circuit in *Taddeo*[14] and the Fifth Circuit in *Grubbs*[15] concluded that it was erroneous to conclude that a cure addressed in § 1322(b)(3) or (b)(5) "was a subset of the power to 'modify' set forth in (b)(2)."[16] Although the introductory "notwithstanding" in (b)(5) may suggest that it was deemed an exception to the antimodification provision of (b)(2), the legislative history makes clear it was added merely to ensure that the power to cure did not affect an amendment that excepted home mortgages from the modification power set forth in (b)(2).

Both the basis for that conclusion and its significance for the present debate require further elucidation.

As originally introduced, § 1322 merely provided that a debtor's plan might modify the rights of holders of secured claims or of unsecured claims, § 1322(b)(2), cure or waive any default, § 1322(b)(3), or cure a default in long term debt within a reasonable time and maintenance of payments while the case is pending,

13. *Nobelman v. Am. Sav. Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

14. *Di Pierro v. Taddeo (In re Taddeo),* 685 F.2d 24, 27 (2d Cir.1982).

15. *Grubbs v. Houston First Am. Sav. Ass'n,* 730 F.2d 236, 246 (5th Cir.1984).

16. *Id.* Similarly, the Second Circuit held in *Taddeo:* "[W]e believe that the power to 'cure any default' granted in § 1322(b)(3) and (b)(5) is not limited by the ban against 'modifying' home mortgages in § 1322(b)(2) because we do not read 'curing defaults' under (b)(3) or 'curing defaults and maintaining payments' under (b)(5) to be modifications of claims." 685 F.2d at 27.

§ 1322(b)(5).[17] Thus "modification" and "cure" were regarded as covering distinct situations, neither being an exception to the other because there was no overlap.[18] In the Senate, however, secured creditors objected to the modification provision, but not the cure provision.[19] As a result, under the Senate bill, debts wholly secured by real estate mortgages were excluded from the debtor's right to modify.[20] But in the floor amendments agreed to by both houses, the Senate exception was further restricted to debts secured by a debtor's principal residence.[21] Neither in the Senate nor in the House–Senate compromise was there any effort to restrict the right to cure, but to avoid any ambiguity that might have been created by the new exception to the modification provision, "notwithstanding" was added to (b)(5) in the House–Senate floor amendments.[22]

From that analysis of legislative history, the Fifth Circuit concluded, en banc, that the court below "was in error in finding that § 1322(b)(5)'s preface, 'notwithstanding paragraph (2),' was a subset of the power to 'modify' set forth in (b)(2)," consistent with the Second Circuit's conclusion in *Taddeo*.[23]

In concluding that an accelerated debt securing a debtor's principal residence could be cured and reinstated, the Ninth Circuit Bankruptcy Appellate Panel relied principally on *Grubbs* and *Taddeo*.[24] Thus it is currently the law of this circuit, as it is in the Second and Fifth Circuits, that the cure rights found in § 1322(b)(3) and (b)(5) are not "subsets" of the "modification" right found in (b)(2). The right to cure is not limited to cures that are not deemed to be modifications when a principal residence is involved. "Cure" and "modification" are distinct concepts that do not overlap.

A similar conclusion was reached in the Supreme Court's dictum in *Nobelman*.[25] In the course of deciding that § 1322(b)(2)'s antimodification provision precluded bifurcation of an undersecured principal residence mortgage pursuant to Code § 506, the Court noted that the antimodification provision does not mean that lenders' rights are wholly unaffected by bankruptcy. The Court noted that the right to foreclose due to a prepetition de-

---

17. *Grubbs,* 730 F.2d at 243. That opinion also clarifies that although (b)(3) was intended to apply to *any* debt provided for under the plan, (b)(5) was added to include long term obligations that might not be provided for by the plan except for the curing of the default; i.e., those paid "outside" the plan. 730 F.2d at 243.

18. The Second Circuit noted in *Taddeo* that as originally introduced in Congress, the bills that ultimately led to the adoption of the Bankruptcy Code "listed the power to cure and the power to modify in different paragraphs, indicating that the power to cure is different from the power to modify," and that secured creditors submitted testimony that "distinguished between modifying a claim (by reducing payments due thereon) and curing a default (and maintaining those payments)." 685 F.2d at 28.

19. *Grubbs,* 730 F.2d at 245.

20. *Id.*

21. *Id.* at 246.

22. *Id.*

23. *Id.*

24. *In re Nelson,* 59 B.R. 417 (9th Cir. BAP 1985). *Taddeo* was also followed in *Great W. Bank & Trust v. Entz–White Lumber and Supply, Inc. (In re Entz–White Lumber and Supply, Inc.),* 850 F.2d 1338, 1340 (9th Cir.1988), which is still good law in this Circuit. *In re Phoenix Bus. Park Ltd. P'ship,* 257 B.R. 517 (Bankr.D.Ariz.2001).

25. *Nobelman v. Am. Sav. Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

fault is checked by the automatic stay, and that " § 1322(b)(5) permits the debtor to cure prepetition defaults on a home mortgage by paying off arrearages over the life of the plan 'notwithstanding' the exception of § 1322(b)(2)." [26] The Court further noted that "These statutory limitations on the lender's rights, however, are independent of the debtor's plan or otherwise outside § 1322(b)(2)'s prohibition." [27]

*Nobelman's* analysis of cures being "outside § 1322(b)(2)'s prohibition" indicates, as *Grubbs* had concluded,[28] that a cure is not an exception to the antimodification provision, because modifications and cures deal with wholly distinct, mutually exclusive, legal concepts. The Court did not say that a cure is a permissible modification, an exception to § 1322(b)(2), but rather was something that did not fall within the scope of modification at all.

The conclusions of *Grubbs* and *Nobelman* that modification and cure are distinct, mutually exclusive topics makes basic sense, for a reason much simpler than the tortured legislative history summarized in *Grubbs*. Both the automatic stay and cure deal with past defaults, whereas the modifications permitted (or prohibited) by § 1322(b)(2) concern future obligations. Thus the antimodification provision says nothing about what can or must be done about past defaults, but merely provides that the debtor's future obligations to a lender cannot be modified from what is provided in the loan documents.[29]

The mutual exclusivity of the concepts of modification and cure means that cases rejecting proposed cures on the ground the cure would constitute an impermissible modification[30] are not good law, at least in the Second, Fifth and Ninth Circuits under *Taddeo, Grubbs* and *Nelson,* and perhaps not anywhere under the *Nobelman* dictum.

■ Moreover, because the reference to lender's "rights" appears only in the modification provision of § 1322(b)(2), this means the categories of rights protected by that provision are only those rights arising in the future. The provisions that deal with past defaults, §§ 1322(b)(3) and (b)(5), do not mention "rights" at all. Consequently *Nobelman's* heavy reliance on the lenders' "rights" as inclusive of all rights "reflected in the relevant mortgage instruments, which are enforceable under [state] law," [31] has no bearing on the issue of cure or waiver of past defaults. It is a mistake to read *Nobelman* as suggesting that all those boilerplate rights must be protected under a cure; to the contrary, it only protects them from modification and

---

26. *Id.* at 330, 113 S.Ct. 2106.

27. *Id.*

28. In concurring, Justice Stevens specifically relied on *Grubbs'* analysis of the legislative history of § 1322. *Nobelman,* 508 U.S. at 332, 113 S.Ct. 2106 (Stevens, J., concurring).

29. It is not necessary for this opinion to determine the precise point in time that differentiates "past" from "future" for purposes of this analysis. "Past" might mean prepetition or preconfirmation, and "future" might mean postpetition or postconfirmation, but that would mean that a debtor could not modify a plan to cure a postconfirmation default, which the Fifth and Eleventh Circuits permit. *Mendoza v. Temple–Inland Mortgage Corp. (In re Mendoza),* 111 F.3d 1264 (5th Cir.1997); *Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle),* 12 F.3d 1008 (11th Cir.1994). Perhaps the appropriate "present" for this analysis is simply the time when the court decides the issue. But as noted above, this need not be decided to resolve the issue presently before this Court.

30. *E.g., In re Threats,* 159 B.R. 241, 243 (Bankr.N.D.Ill.1993) ("Defeating the due-on-sale and assumption clauses would impermissibly modify Fleet's rights.").

31. *Nobelman,* 508 U.S. at 329, 113 S.Ct. 2106.

distinguishes the cure situation, which can affect them as much as does the automatic stay. Arguments based on the lender's state law rights [32] are therefore unpersuasive in those circuits, such as the Ninth, that regard modification and cure as distinct concepts. At least in these circuits, the right to cure and the requirements for a cure of past defaults must be determined according to bankruptcy law.

**Any Default May Be Cured**

■ The Debtors here are not seeking any modification of the Bank's rights under its deed of trust, because they are not seeking to modify their future obligations that arise under the deed of trust postconfirmation. They are not, for example, seeking to change the amount of each future month's installment payment, nor the right to sell the property in violation of the due on sale clause. Those would be forward-looking modifications that are prohibited by § 1322(b)(2).

Instead, they are seeking to deal with a past default, a prepetition default, arising from their prepetition purchase of the property without obtaining the Bank's consent. The analysis above demonstrates that the ability to deal with prepetition defaults, without modifying future obli-

gations, is governed by §§ 1322(b)(3) and (b)(5).

The Bank's argument is essentially that the prepetition violation of the due on sale clause is an incurable default, particularly in this case where the Bank's original borrower is dead. Implicit in this argument is an assumption that §§ 1322(b)(3) and (b)(5) permit the cure of only certain defaults, perhaps only payment defaults, whereas others may be either legally or practically incurable. But is this assumption valid?

For two reasons, the language of the Code does not support any argument that certain defaults are incurable. First, both (b)(3) and (b)(5) specifically provide for the "curing of *any* default" (emphasis added). That language certainly implies that all defaults may be cured, not just certain kinds. Indeed, the Ninth Circuit relied on precisely that language to reject an argument that a particular kind of default was incurable under the identical language applicable to Chapter 11 plans, in § 1123(a)(5)(G): "Section 1123 speaks of 'any default'.... The natural reading of these sections is that plans may cure all defaults...." [33] The Fifth and Eleventh Circuits have relied on that language to conclude that postconfirmation defaults may be cured,[34] and the leading authorita-

---

**32.** *E.g. Threats,* 159 B.R. at 243.

**33.** *Great Western Bank & Trust v. Entz–White Lumber and Supply, Inc (In re Entz–White Lumber and Supply, Inc.),* 850 F.2d 1338, 1341 (9th Cir.1988). The bank in *Entz–White* argued that a balloon note that naturally matured prepetition was not curable, because the failure to pay the note at maturity could not be undone, the clock could not be turned back, *i.e.,* cures could only be used to decelerate debts that had been accelerated. The debtor argued that it was a default that could be cured, by full payment at confirmation. Even though the debtor did not seek to pay the fully matured debt over time, the debtor sought that right to cure in order to avoid the

default interest that had accrued since the default. The court upheld the debtor's argument. As noted in note 24 above, despite some intervening amendments to the Code, *Entz–White* is still good law in this Circuit. *In re Phoenix Bus. Park Ltd. P'ship,* 257 B.R. 517 (Bankr.D.Ariz.2001).

**34.** "Section 1322(b)(5) clearly states that a plan may provide for the curing of *any* default." *Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle),* 12 F.3d 1008, 1010 (11th Cir. 1994) (emphasis in original). *Accord, Mendoza v. Temple–Inland Mortgage Corp. (In re Mendoza),* 111 F.3d 1264, 1268 (5th Cir.1997) ("The *Hoggle* court concluded that § 1322(b)(5) expressly authorized a plan of

tive treatise on Chapter 13 concurs that "[t]here is logic to this view." [35]

Moreover, if the provision were meant to apply only to certain defaults, one would expect to find some indication of which defaults the drafters meant to include, and which were excluded.[36] Chapter 13 provides no such guidance.

Consequently, I must conclude that the drafters did not intend to exclude any particular kinds of defaults from the right to cure. As the Ninth Circuit held in *Entz–White*, "plans may cure all defaults."

**No Defaults Are Inherently Incurable**

Even if the drafters did not intend to exclude any kinds of defaults from the legal right to cure, the Bank could argue that the drafters meant to grant legal authority to cure only when that could be accomplished as a practical matter, such as where missed installment payments can be made up. But if a default could not be cured as a practical matter, then the legal authority to do so is irrelevant. And here, the Bank can well argue that the predefault conditions cannot be restored because the original borrower is dead. In any event it would little benefit the Debtors to cure the default by selling their home back to Emmet Murray even if they could, and *then*, having no ownership rights to the property, they would have no right to cure

because there would be no secured claim against the Debtors or against property of the estate.

Again, of course, there is no language in the Code to suggest the drafters recognized a practical limitation on the legal ability to cure. And in any event, that argument has also been rejected by the Ninth Circuit.

In *Entz–White*,[37] the bank argued that because the debtor's balloon note obligation naturally matured prepetition, without acceleration, that was a default that could not be cured under § 1123.[38] It argued that cure was limited to deceleration of an accelerated obligation, which would not apply to an obligation that naturally matured prepetition. In other words, the failure to pay the obligation when it fully matured was an historical fact that could not be undone by payment later. The Ninth Circuit rejected this argument, primarily by relying on the plain language of the statute that permits cure of "*any* default." [39] It also relied on the House Report on § 1124, stating that "Reinstatement consists of curing *any default* (other than a default under an ipso facto or bankruptcy clause) and reinstatement of the maturity of the claim or interest." [40] It added: "This broad language, subject only to two listed exceptions, mirrors the lan-

---

reorganization to provide for the curing of *any* default with the postconfirmation arrearages to be paid under a modified plan, notwithstanding § 1322(b)(2)'s anti-modification language.") (emphasis in original).

**35.** "There is logic to this view [of *Hoggle* and *Mendoza* that postpetition defaults can be cured] because both § 1322(b)(3) and § 1322(b)(5) are worded that a Chapter 13 debtor can cure '*any* default.'" 2 Keith M. Lundin, *Chapter 13 Bankruptcy* § 131.1, at 131–1–2 (3d Ed.2000).

**36.** *Cf. Hoggle,* 12 F.3d at 1010 ("Congress could have easily inserted the word prepeti-

tion to modify default but failed to do so. The omission is significant.").

**37.** 850 F.2d 1338 (9th Cir.1988).

**38.** Although *Entz–White* arose under Chapter 11, the Ninth Circuit relied on cases dealing with cures under Chapter 13, such as *Grubbs* and *Taddeo*, noting that "the underlying concept of cure is the same throughout the Bankruptcy Code." 850 F.2d at 1340 n. 1.

**39.** *Id.* at 1341.

**40.** *Id.* (emphasis added by Ninth Circuit).

guage of the statute and refutes [the bank's] position." [41]

So, at least in the Ninth Circuit, the law is clear that "plans may cure all defaults."

But has that law been overruled by *Claremont Acquisition*?[42] That case involved a debtor's attempt to assume and assign an executory contract, a General Motors dealership franchise. However, the debtor's business had been closed for two weeks prepetition, and the franchise agreement provided that it was a default to be closed for more than seven days. The bankruptcy court, however, construing a recent amendment to § 365(b)(2), concluded that it did not require any cure of nonmonetary defaults. Consequently there was no need for that court to determine, or even for the debtor to argue, that the "going dark" default was curable.

But the Ninth Circuit reversed the bankruptcy court's interpretation of § 365(b)(2), holding that even nonmonetary defaults must be cured (the amendment merely being intended to excuse payment of penalty rates or penalty provisions that arise from nonmonetary defaults). But instead of remanding for a bankruptcy court's determination of how the nonmone-

tary default could be cured, the court stated that "this default is a 'historical fact' and, by definition, cannot be cured." [43]

Does *Claremont* overrule *Entz–White's* conclusion that all defaults are curable? Not necessarily. First, both opinions were merely panel opinions, and it is the clear law of the Ninth Circuit that one panel may not overrule a prior panel's decision; that can only be done *en banc*.[44] Moreover, *Claremont* never considered the *Entz–White* opinion or analysis. Perhaps this is not surprising, since the key issue was not whether the default was curable, but rather whether the Code excused cure. The debtor never had reason to argue, either to the bankruptcy court or the Ninth Circuit, that it could cure the default, because its argument was that the Code expressly excused any cure of that type of nonmonetary default. Finally, although the Code language is often very similar, the issue in *Claremont* arose under § 365 rather than under the cure provisions applicable to Chapter 11 and 13 plans. And unlike the cure provisions applicable to plans and Arizona's deed of trust law, the law of executory contracts does recognize the significance of certain

---

41. *Id.*

42. *Worthington v. Gen. Motors Corp. (In re Claremont Acquisition Corp.)*, 113 F.3d 1029 (9th Cir.1997).

43. 113 F.3d at 1033.

44. Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court. As Anastasoff itself states, a later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule; it may not any more disregard the earlier panel's opinion than it may disregard a ruling of the Supreme Court. *Anastasoff [v. United States]*, 223 F.3d [898,] 904

[*vacated as moot on reh'g en banc*, 235 F.3d 1054 (8th Cir.2000)]; see also *Santamaria v. Horsley*, 110 F.3d 1352, 1355 (9th Cir.1997) ("It is settled law that one three-judge panel of this court cannot ordinarily reconsider or overrule the decision of a prior panel."), rev'd, 133 F.3d 1242 (9th Cir.) (en banc), amended by 138 F.3d 1280 (9th Cir.), cert. denied, 525 U.S. 823–24, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998); *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 425–26 (5th Cir.1987) (A "purpose of institutional orderliness [is served] by our insistence that, in the absence of intervening Supreme Court precedent, one panel cannot overturn another panel, regardless of how wrong the earlier panel decision may seem to be.").

*Hart v. Massanari*, 266 F.3d 1155, 1171–72 (9th Cir.2001) (footnote omitted).

personal relationships and state laws that may render contracts unassumable.[45]

For these reasons, this Court must conclude that *Entz–White* is still good law at least with respect to cures under Chapter 11 and 13 plans, so in this circuit at least, "plans may cure all defaults."

## Most, Possibly All, Nonmonetary Defaults May Be Cured

■ If plans may cure all defaults, this leaves the question of what is required for cure. For missed payments the answer is easy—make up the payments. But what if the default is a nonmonetary default such as a violation of a due on sale clause or a "going dark" provision?

Certainly one aspect of cure must be to cease any ongoing violation. For example, one part of a cure of a "going dark" clause must be to reopen the store. This does not seem to help here, however, where there is no ongoing violation of the due on sale clause—the Debtors are not in the process of selling the home without the lender's consent, nor do they seek the

right to do so in the future. The prohibited sale has already occurred.

What else, if anything, must be done to cure a nonmonetary default other than to cease any ongoing violations? Perhaps nothing. For example, what would be necessary to cure a default of an *ipso facto* clause, a default arising solely from the fact of filing the bankruptcy case?[46] Although § 365(b)(2)(B) makes it unnecessary to cure such defaults in executory contracts and leases, there is no similar provision excusing cure of such breaches in nonexecutory contracts, such as the note and deed of trust involved here. It might be contended that § 541(c)(1) voids such clauses upon the filing of the bankruptcy case.[47] That seems to have been the intent of the Bankruptcy Commission's original draft of what became the Bankruptcy Code, because it "invalidated" *ipso facto* clauses and restraints on alienation,[48] and the Ninth Circuit has referred to the provision ultimately adopted as "voiding" such provisions.[49] But there is contrary author-

---

**45.** *E.g.*, 365(c)(1); *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747 (9th Cir.1999) (debtor in possession may not assume its own nonexclusive patent license because such licenses are not assignable under federal common law, and are therefore not assumable under § 365(c)).

**46.** For a brief history of the origins and uses of such clauses and an argument for their wholesale elimination from contracts, see Randolph J. Haines, *Time to Eliminate Ipso Facto Clauses*, Norton Bankruptcy Law Adviser (May 2002).

**47.** Section 541(c)(1) provides that except for valid spendthrift trusts, "an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking

possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." Clause A deals with what are commonly called restraints on alienation, and clause B deals with *ipso facto* clauses.

**48.** *"Invalidity of Certain Restrictions and Forfeitures.* Any prohibition on the transfer of property by the debtor and any provision for forfeiture or termination conditioned on the filing of a petition are unenforceable as to property of the estate...." Report of the Commission on the Bankruptcy Laws of the United States Pt. II, § 4–601(b), at 147–48, H.Doc. 93–137, 93d Cong., 1st Sess. (1973).

**49.** "Congress, it is true, while voiding all contract clauses automatically terminating the contract on a party's bankruptcy, noted that the other contractual obligations of the parties must stand...." *Post v. Sigel & Co., Ltd. (In re Sigel & Co., Ltd.)*, 923 F.2d 142, 145

ity that § 541(c)(1) does so only to the limited extent necessary to permit property to become property of the estate, so such clauses remain effective thereafter and thus binding on the trustee.[50] If such clauses survive, how can the default be cured so that the nondebtor party cannot assert the default postconfirmation? Perhaps nothing more is required for the cure other than complying with the Code's confirmation requirements.[51]

To restore the lender to a predefault situation, which is the essence of cure, it would seem the debtor must compensate the lender for any loss occasioned by the default. For example, if "going dark" caused a loss of percentage rents, perhaps those should be estimated and paid as part of a cure.

The Bank may object that the violation of its due on sale clause cannot be compensated by money. But that argument is not well supported by the parties' conduct, by state or federal nonbankruptcy law, or by the Bankruptcy Code.

The Bank argues strenuously (even in the absence of any waiver argument by the Debtors) that the Bank has not waived its right to enforce its due on sale clause. The Bank argues that it did not know these Debtors were the source of the payments it received for the four or five months between Debtors' acquisition of the property in November, 2000, and the monetary default in April, 2001. It says the checks were received at a P.O. Box and deposited without discerning the source, and that it did not learn of the sale until notified by its foreclosure trustee after it had commenced the trustee's sale due to the monetary default.

But the Debtors' purchase agreement was promptly and duly recorded, and under Arizona law that recording constitutes constructive notice to the world of the Debtors' interest in the property.[52] Moreover, because Arizona law requires notice to any subsequent purchaser of a trustee's sale, the Bank's agent had to actually

(9th Cir.1991) (quoting House and Senate Reports on § 365(e): "The unenforceability of ipso facto or bankruptcy clauses proposed under this section will require courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases.").

50. *Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487 (3d Cir.1997) (§ 541(c)(1)(A) overrides state law prohibiting assignment of certain tort actions to permit them to enter the estate, but does not permit trustee to sell such an action). The case deals only with the effect on restraints on alienation in clause A, not with *ipso facto* clauses dealt with in clause B, but its reasoning is equally applicable to *ipso facto* clauses because it hinges on the introductory language of § 541(c)(1), which addresses only how property affected by such clauses "becomes" property of the estate "notwithstanding" such clauses.

51. This analysis further supports the conclusion that all defaults are curable under the Code. Given the express exception from the

obligation to cure such defaults in executory contracts and leases in § 365(c), it is difficult to hypothesize a reason why Congress would have intended such clauses to prevent cures under §§ 1123(a)(5)(G) and 1322(b)(3) & (b)(5) for nonexecutory contracts. By definition, nonexecutory contracts involve a much less close relationship between the debtor and nondebtor party, because the continuing performance obligations cannot be mutual or else the contract would be executory. There is no logical reason why an *ipso facto* clause would create an incurable default for a nonexecutory contract, but need not be cured for an executory contract.

52. "The record of a grant, deed or instrument in writing authorized or required to be recorded, which has been duly acknowledged and recorded in the proper county, shall be notice to all persons of the existence of such grant, deed or instrument...." A.R.S. § 33–416.

know of the Debtors' ownership *before* the trustee's sale was commenced; it could not have been validly commenced as against the Debtors unless the Bank notified them.[53]

But despite both this actual and constructive knowledge, the Bank never complained about a violation of its due on sale clause until after the monetary default and, indeed, until after the bankruptcy was filed. The Bank's conduct, therefore, suggests that all it was really concerned about was the money—there was no complaint so long as payments were regularly made.

Both state and federal law also suggest that due on sale clauses are really all about money or the security for its payment, not about the sanctity of the personal relationship between lender and borrower. In 1971, the Arizona Court of Appeals restricted the enforcement of due on sale clauses to situations where the lender could demonstrate that its security was threatened.[54] Shortly thereafter, the Arizona legislature enacted A.R.S. § 33–806.01, which restricts the fee a beneficiary may charge upon sale of residential trust property of less than 2½ acres, and prohibits an increase of the interest rate on the debt in excess of ½%. In 1978, the Arizona Supreme Court held that enforcement of a due on sale clause is an unlawful restraint on alienation unless the lender can show that its security is jeopardized.[55]

In 1982, the federal government passed the Garn–St. Germain Depository Institutions Act of 1982, superseding state laws restricting due on sale clauses.[56] But in doing so, the government expressly "en-couraged [lenders] to permit an assumption of a real property loan at the existing contract rate or at a rate which is at or below the average between the contract rate and market rates,"[57] indicating that the driving force behind the legislation was lenders' desire to increase interest rates at a time when market rates were increasing. Clearly no lender could be "encouraged" to permit assumption at the average between the contract rate and the market rate if the market rate were below the contract rate.

Thus both sides of that historic state-federal dispute inherently recognized that due on sale clauses were all about interest rates, not the sanctity of the personal borrower-lender relationship. Arizona law further makes clear that due on sale clauses are all about money:

> Historically, lenders have used due-on-sale or acceleration clauses to protect themselves from unanticipated risks by ensuring that a responsible party continues in possession of the mortgaged property. The clause was invoked to ensure that property was not sold to an irresponsible party who might damage or destroy the security....

> As interest rates began rising in the mid–1960's, lenders started using due-on-sale clauses not only as a means of protecting their security, but also as a tool to keep their loan portfolios at current interest rates. Thus, the lender would consent to a sale only if the purchaser would agree to new loan repay-

---

53. A.R.S. § 33–809(b)(2).

54. *Baltimore Life Ins. Co. v. Harn*, 15 Ariz. App. 78, 486 P.2d 190 (1971), *pet. for review denied*, 108 Ariz. 192, 494 P.2d 1322 (1972).

55. *Patton v. First Federal Sav. & Loan Ass'n*, 118 Ariz. 473, 578 P.2d 152 (1978).

56. Pub.L. 97–320, 96 Stat. 1505, which added 12 U.S.C. § 1701j–3.

57. 12 U.S.C. § 1701j–3(b)(3).

ment conditions.[58]

In a class action seeking to enjoin enforcement of due on sale clauses during the "window period" permitted by Garn–St. Germain, the defendant savings and loan argued that due on sale clauses are "necessary to keep the savings and loan associations' loan portfolios current with rising market interest rates, and that the value of the mortgage in the secondary mortgage market significantly decreases if the due-on-sale clause is unenforceable."[59]

Consequently, both Arizona law and Garn–St. Germain suggest that a cure of a violation of a due on sale clause should consist of ensuring that the purchaser will not damage or destroy the lender's collateral, and possibly an increase in the interest rate if the market has risen since the loan was originally made. Nothing in Arizona law suggests that violation of a due on sale clause, at least by a responsible buyer, is inherently incurable. And of course if the purchaser/debtor were so irresponsible that the lender could demonstrate a risk to its security, it would be entitled to stay relief under § 362(d)(1) without regard to the violation of the due on sale clause.

■ The Code also suggests that most, if not all, cures may be made in monetary terms. Most directly on point is § 1322(e), the language of which suggests that all cures are measured solely in monetary terms: "if it is proposed in a plan to cure a default, the *amount* necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law" (emphasis added). Similarly, the Code's definition of "claim" treats most equitable remedies as monetary claims. § 101(5)(B). It does not permit the holder of an equitable remedy to avoid discharge except in the relatively rare circumstance where the equitable remedy is for a breach that does not give rise to any right to payment.[60] Perhaps there are equitable rights the loss of which cannot be adequately compensated by money, but the due on sale clause does not appear to be among them.

Consequently this Court concludes that, as the Ninth Circuit stated, plans may cure any default, at least absent a showing of an entitlement to an equitable remedy that would give rise to a nondischargeable claim because neither damages nor a surrender of the collateral could ever provide an adequate remedy at law, and a showing that the debtor's plan could not provide that remedy. The only remaining issue is what is required to accomplish such a cure on the present facts.

There is no basis in law to conclude that a violation of a due on sale clause cannot be compensated in money, perhaps in a higher interest rate, if the market warrants it. Moreover, the Bank's prepetition conduct indicates that money is what it is all about, since it did not bother itself to monitor the public records to determine if there had been a sale of its collateral nor

58. *Snow v. W. Sav. & Loan Ass'n,* 152 Ariz. 27, 730 P.2d 204, 207–08 (1987).

59. *Scappaticci v. Southwest Sav. and Loan Ass'n,* 135 Ariz. 456, 662 P.2d 131, 132 n. 3 (1983).

60. *Compare Torwico Elecs. v. State of New Jersey (In re Torwico Elecs., Inc.),* 8 F.3d 146 (3d Cir.1993) (environmental protection agency's cleanup order was not a "right to payment" and therefore not discharged by agency's failure to timely file proof of claim) *and United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1008 (2d Cir.1991) *with Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) *and In re Udell,* 18 F.3d 403, 407 (7th Cir.1994) ("a 'claim' is a right to an equitable remedy that can be satisfied by an 'alternative right to payment' ").

did it appear to care who was writing the checks, so long as the money kept coming.

### Conclusion

There has been no argument or evidence regarding what may be required for these Debtors to cure the default arising from the due on sale clause, only legal argument that it could not be cured.[61] The Court has concluded that the default is legally curable under a plan, so the Bank's motion for summary judgment must be denied. There may remain a confirmation issue as to whether the interest rate on the Bank's debt should be adjusted up or down to constitute a cure of the prepetition violation of the due on sale clause. The further course of the case will address those issues.

---

**61.** Although there has been no evidence on this point and the Court has not researched it, the Court doubts that current home loan interest rates are higher than when Emmet Murray took out the loan at issue here. And if they are, equity may dictate that this Court follow the public policy announced in Garn– St. Germain that the amount of the increase be limited to the average between the contract rate and the current market rate. Query whether equity would also require a similar *reduction*, if market interest rates have fallen and the lender nevertheless insists upon enforcing its due on sale clause.